HIRAM F. HENRY, Appellant, *v.* NORMAN M. ALLEN and Another, Respondents.

*Principal and agent — when the principal is chargeable with the knowledge of his agent and his manner of doing business — notice.*

A principal is chargeable with the knowledge possessed by his agent and the manner in which he transacts the business placed in his charge.

Notice of a fact to an agent is constructive notice thereof to the principal where it arises from or is at the time connected with the subject-matter of his agency ; it is presumed that an agent has communicated such fact to his principal, and if he has not, the principal, having intrusted the agent with the particular business, a third person has a right to deem his acts and knowledge obligatory upon his principal. (BRADLEY, J., dissenting.)

APPEAL by the plaintiff, Hiram F. Henry, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of Cattaraugus on the 29th day of February, 1892, upon the report of a referee dismissing the plaintiff's complaint upon the merits.

*Sherman S. Rogers*, for the appellant.

*William H. Hendersom*, for the respondents.

HAIGHT, J. :

This action was originally commenced against Norman M. Allen and Hoyt M. Allen as co-partners engaged in the business of banking, at Dayton, N. Y., under the firm name of Norman M. Allen & Son, but since this appeal was taken Hoyt M. Allen died.

The action was brought to recover the sum of $27,999, being the amount of thirty-three instruments in writing, each of which was in the following form, omitting dates and amounts :

"$......                    DAYTON, N. Y., ..........188..
        "NORMAN M. ALLEN & SON, Bankers.
    "Pay to the order of F. Monson, ............ dollars.
                            "N. M. ALLEN & SON."

The plaintiff resided in the village of Gowanda, distant about four miles from the residence of the defendants, but had no personal

acquaintance with either. One Forbes Monson, the person named as payee in the instruments sued upon, also resided in the village of Gowanda, and the plaintiff was intimately acquainted with him.

On the 12th day of March, 1886, the plaintiff was the owner of three certificates of deposit issued by the Bank of Gowanda, one of which was for $1,163.54, and the other two for $1,000 each. Chiefly through the representations of Monson he had become suspicious of the solvency of the bank, and decided to withdraw his money therefrom. He accordingly entered into an arrangement with Monson by which he was to deliver to him his three certificates of deposit for the purpose of having him withdraw the money from time to time in such manner as not to create a suspicion on the part of the officers of the bank of his purpose, or of where the same was to be placed, and to deposit the same with Norman M. Allen & Son. It was further arranged that from time to time thereafter he should send or deliver to Monson the money which he might be able to save from his business as showman whilst upon the road, and that Monson, acting for and on his behalf, should take it to the defendants' bank and there deposit it, and, as the referee has found, to send or deliver to him for each deposit so made either his individual check or the check of the defendants indorsed by Monson for the amount of each deposit; that Monson should have charge of that branch of his business and of making deposits with the defendants, and of negotiating with them in reference thereto, and of looking after the same, and when the amount so deposited should aggregate the sum of $5,000 a loan to the defendant Norman M. Allen should be made therefor upon a bond secured by a mortgage upon real estate. As a part of such arrangement it was agreed that Monson should pay him six per cent interest on all sums delivered to him for deposit. Pursuant to this arrangement he delivered to Monson the three certificates of deposit, and from time to time thereafter up to the 4th day of March, 1889, sent by letter and delivered to Monson various sums of money for deposit with the defendants, amounting in the aggregate to $27,999, which sums he charged to Monson as the same were remitted to him from time to time.

On the 12th day of March, 1886, Monson opened an account with the defendants in their bank by making a deposit to his own credit therein of a part of the proceeds of one of the certificates of deposit

delivered to him by the plaintiff, and from time to time thereafter made other deposits to his own credit of the various sums which he received from the plaintiff. In making such deposits he procured from the defendants the thirty-three instruments upon which this action is founded, each instrument being filled out with the date and the amount of the deposit. In order to procure the same he stated and represented to the defendants that the money was his own, that he was a co-partner of the plaintiff Henry in his business, and that the money had been received by him as his share of the profits in the business, and that he desired the instruments solely for his own accommodation, and as a memorandum only, to be used by him in his settlement with the plaintiff, after which he would return the same to the defendants, and that they should not be transferred or delivered to any person or persons, and that neither of them should have any legality as commercial paper, and that neither should be a valid or binding obligation on the part of the defendants or either of them. The referee has found that these representations were made with a fraudulent intent and purpose, to induce the defendants to execute and deliver to him the instruments in question, and that the defendants, relying upon such statements and representations, believing them to be true, were induced to make, and did make and deliver to Monson from time to time the instruments in question, neither of which was charged up to him or his account; that he paid nothing therefor, and that each and every of them was and is entirely without consideration. It further appears that shortly after the receiving of each of such instruments, Monson wrote upon the back thereof to pay to the order of the plaintiff, and signed his name thereto, and either mailed or delivered the same to the plaintiff, who received each instrument believing that Monson had deposited his money according to the terms of their agreement, and had procured each of the papers in consideration of such deposit. The plaintiff retained the instruments, and did not present them to the defendants for payment until the 12th day of February, 1891, when they were all presented together for payment by the plaintiff's attorney. In June, 1886, Monson paid to the plaintiff the interest on all moneys delivered to him up to July 1, 1886, at the rate of six per cent, and continued to pay such interest quarterly upon all moneys received by him up to

January, 1890. The defendants had no knowledge or information of the agreement existing between the plaintiff and Monson, or that the plaintiff had, or claimed to have, any interest in the money so deposited, or that their said instruments had ever been delivered to the plaintiff, until February, 1891. In the meantime Monson had checked out all of the money deposited by him to his credit with the defendants, and on the 9th day of February, 1891, absconded.

Some criticism has been made upon the findings. It is said that the plaintiff never agreed to accept the individual check of Monson. For the first money derived by Monson upon one of the certificates of deposit delivered to him by the defendants, he mailed to the plaintiff his individual check inclosed in a letter, in which he appears to have apologised for not procuring it to be certified, pleading as an *excuse* that he had forgotten to do so. To this the plaintiff replied, saying : " There is no earthly need of your having your check certified. Why, what an idea. I don't want your checks at all." Thereafter Monson appears to have procured the defendants' checks payable to his order, which he indorsed over to the plaintiff. The plaintiff testified that in his conversation with Monson, Monson wanted to know of him if N. M. Allen's check would be security ; that he told him he would make inquiries, and subsequently told him that he would take N. M. Allen & Son's checks provided he would indorse them, and that they began the business with that understanding. It is, therefore, apparent that the plaintiff did not agree to take the individual check of Monson, but that the understanding was that he should take the check of the defendants indorsed by Monson.

It appears that Monson paid plaintiff the interest, the referee finds, down to January 1, 1890. That is the last date of payment shown by the receipts ; but it is claimed by the appellant that it appears from the letters written by the plaintiff to Monson that the interest was paid down nearly to the time that Monson absconded. Under the view taken by us this variance is unimportant. The plaintiff knew that Monson was paying the interest upon his deposits. He testified that he supposed that Monson in some way obtained the interest from Allen. But his letters leave this question in some doubt, for he had the defendants' check for each deposit in his possession, and these checks contained no promise to pay interest. In

several of his letters to Monson he speaks of the interest, and expresses some doubt as to whether he ought to take interest from him. In his letter from Bangor, under date of "10–3–87," he says: "Just received yours 6th mentioning payment to Leonard $172.50 to my credit, same being interest on my deposits as understood. I feel rather sheepish in this interest matter, but I presume as long as you are bound to do it I shall have to accept it. Inclosed find my receipt for the same. With every appreciation, believe me, truly, Henry."

And again, from Perth Amboy, October fifth (the year not given) he writes: "I don't feel right to take interest from you on money that is actually a bother to you. I don't want your friendship to extend to such matters." We shall, however, assume, for the purposes of this review, that the plaintiff supposed that Monson had procured the interest which he paid him from Allen & Son.

It is also claimed that the referee erred in finding that the defendants had no knowledge that the money deposited with them by Monson belonged to the plaintiff. It is claimed that Henry wrote a letter to Allen & Son about the time that Monson commenced depositing the money with them, in which he stated in substance that Monson had influenced him to withdraw his funds from the Bank of Gowanda and to place them in the defendants' bank; that Monson was a great friend of his and very enthusiastic over his success, but wanted the matter to be strictly a business matter. He, however, kept no copy of the letter; could not tell at what place he wrote it; his correspondence was very voluminous, and that he could not be certain as to the exact contents of the letter. N. M. Allen testified that he remembered receiving a letter from the plaintiff; that he was unable to find it among his files; that he thought he had passed it over to Monson; that he could not recall the contents of the letter further than that it conveyed to him no idea that the plaintiff had withdrawn any money from the Bank of Gowanda to be deposited with them through Monson. The referee appears to have believed the defendants' testimony, and where there is a conflict between two interested parties it is our usual practice to follow the findings.

We must, therefore, treat the instruments in suit as memorandum checks issued by the defendants to Monson, without consideration,

and in his hands creating no liability against the defendants. They could only become liable thereon by a transfer of the checks by Monson to a purchaser in good faith for value in the regular course of business, without notice of the arrangement under which they were issued. Is the plaintiff such a holder? It is not shown that he had actual knowledge of the facts under which they were issued, but it is found as a fact that he had constituted Monson his agent to take his money and deposit it with the defendants, and this we do not understand to be controverted. By delivering his money to Monson he invested him with the indicia of title, and thus enabled him to induce the defendants to believe that the money belonged to him. As we have seen, he took the money to the defendants, represented it to be his, deposited it with them, had credit given to himself in his individual account, and subsequently withdrew it upon his own checks. Were it not for the checks it would not be claimed that the defendants, after the repayment of the money so deposited by Monson to him, were liable to the plaintiff. Their liability is sought to be established through the memorandum checks, but, as we have seen, they were induced to believe that the money belonged to Monson, and were induced by him, at the time of making the several deposits, to issue to him the memorandum checks in question under the representation that they would be kept by him and not delivered to any other person. Monson exceeded his authority as agent of the plaintiff, and, as found, intended to defraud the defendants. He did not deposit the money in the name of his principal, as he was expected to do. He procured the checks upon the representation stated, and did not disclose that fact to the plaintiff; but he was authorized to take the money to the defendants, to deposit it, to procure their checks therefor, to indorse the same, and to return them to the plaintiff. The plaintiff ought to have known that Monson was depositing the money with the defendants in his own name from the fact that the checks issued therefor were issued to him and payable to his order. This fact should have caused him to make inquiry, but he appears not to have done so, but to have rested under the belief that his agent had properly performed his duty. The rule, as we understand it, is that the principal is chargeable with the knowledge possessed by his agent and the manner in which he transacts the business placed in his charge, and, as applied to the facts of this case, the plaintiff must be

charged with notice of the facts under which Monson procured the memorandum checks to be delivered to him by the defendants.

Story on Agency, at section 140, says: "Upon a similar ground notice of facts to an agent is constructive notice thereof to the principal himself, where it arises from, or is at the time connected with, the subject-matter of his agency, for, upon general principles of public policy, it is presumed that the agent has communicated such facts to the principal, and, if he has not, still, the principal having intrusted the agent with the particular business, the other party has a right to deem his acts and knowledge obligatory upon the principal; otherwise, the neglect of the agent, whether designed or undesigned, might operate most injuriously to the rights and interests of such party."

And again, at section 419, he says: "This doctrine applies *a fortiori* to every case where the agent does not contract in his own name, but solely in the name of his principal, for, in such a case, the principal is not only the contracting party, but he is the sole contracting party, exclusive of the agent, and is alone competent to sue or enforce any other remedy thereon. In all cases of this sort, however, the principal, while he is entitled to all the advantages and benefits of the contract of his agent, must take them with all the attendant burdens and subject to all the attendant just counterclaims and defenses of the other contracting party. Thus, if the contract of the agent is impeachable on account of the fraud, imposition, misrepresentation or other misconduct of the agent, the principal is affected with all the consequences thereof, and cannot avail himself of his own innocence to support what would otherwise be an unfounded or defective title. So, if the agent has sold goods in his own name, no other person being known as principal, and the agent agrees at the time of the sale that the vendee may set off against the price a debt due to him by the agent, that set-off will be as good against a suit brought by the principal as it would be if the suit was brought by the agent for the price."

And again, at section 420, he says: "Neither will it make any difference in such cases   *   *   *   that the principal, at the time of entering into the contract, is known or unsuspected, nor that the third person has dealt with the agent, supposing him to be the sole

principal. The only effect of the last consideration is, that the principal will not be permitted to intercept the rights of such third person in regard to the agent, for he must take the contract, subject to all equities, in the same way as if the agent were the sole principal. Thus, for example, if the agent is the only known or supposed principal, the person dealing with him will be entitled to the same right of set-off as if the agent were the true and only principal. But, subject to these rights and those of the agent himself, the principal may generally sue upon such a contract in the same manner as if he had personally made it."

Mechem, in his work upon Agency, at section 773, says: " But if the principal would avail himself of the benefits of a contract made by an agent in his own name, without disclosing his principal, he must also assume the responsibilities of the contract. He must take the contract as it exists at the time he interposes, and subject to all the rights which the other party then possesses against the agent. In the homely but expressive language of a learned judge, the principal must ' step into the shoes of the agent.' Hence, where a third person, who has entered into a contract with the agent in ignorance of the fact that he was not the real principal, as he assumed to be, is sued upon the contract by the principal, he may avail himself, as against the principal, of every defense, whether it be by common law or statute, which existed in his favor against the agent at the time the principal first interposed and demanded performance to· himself. This right is not affected by the fact that the agent in thus entering into the contract in his own name, without disclosing his principal, acted in contravention of the express directions of his principal."

In the case of *The Bank of the United States* v. *Davis* (2 Hill, 451) the action was brought to recover the amount of two bills drawn by the defendant. It appears that these bills were transmitted by the drawer to Williams, one of the directors of the bank, for the purpose of having them discounted for the benefit of the former; that Williams put his own name upon the paper, and procured it to be discounted for himself and appropriated the avails. At the time he was one of the five directors of the bank constituting the board of discount. His associates had no knowledge of his fraudulent use of the bills. It was held that the bank could not

recover. NELSON, Ch. J., in delivering the opinion of the court, says: " The general rule is undisputed that notice to the agent is notice to the principal, if the agent comes to the knowledge of the fact while he is acting for the principal in the course of the very transaction which becomes the subject of the suit; for, upon general principles of policy, it must be taken for granted that the principal knows whatever the agent knows. There is no difference between personal and constructive notice except in respect to the guilt; for, if there were, it would produce great inconvenience, as notice might be avoided in every case by employing an agent. \* \* \* It is said, however, that Williams was but one of the five empowered by the bank to represent it in this transaction; that the bank is not, therefore, to be held responsible for his individual fraud at the time, nor can it be chargeable with his knowledge of the facts under which the paper in question was discounted; and that such knowledge is chargeable only when the agent has full power to act for the principal in the particular case. It is not to be denied that if the principal employs several agents to transact jointly a particular piece of business, he is equally responsible for the conduct of each and all of them while acting within the limit and scope of their power, as completely so as he would be for the conduct of a single agent upon whom the whole authority had been conferred. He cannot shift or avoid this responsibility by the multiplication of his agents. It is also clear that the corresponding responsibility of each of the several joint agents to the principal for the faithful discharge of their duties is as complete and perfect as in the case of a single agency; and any prejudice to the principal arising from fraud, misconduct or negligence of either of them would afford ground for redress from the party guilty of the wrong. These are general conceded principles for which no authority need be cited. One of the grounds for charging the principal with the knowledge possessed by the agent is because the latter is bound to communicate the fact to the former, and is liable for any prejudice that may arise from a neglect in this respect; and, hence, the law presumes that the principal has actual notice."

In *Hyatt* v. *Clark* (118 N. Y. 563, 569) it is said by VANN, J., after quoting from Story on Agency: "In other words she was

chargeable with all the knowledge that her agent had in the transaction of the business he had in charge."

In *Adams* v. *Mills* (60 N. Y. 533, 539) it is said that "his notice and knowledge must be regarded as notice to and knowledge of the wife according to the well-settled principle that a principal is chargeable with all the knowledge the agent possesses in the transaction of the business he has in charge." (See, also, *Myers* v. *The Mutual Life Ins. Co.*, 99 N. Y. 1–11; *Hogan* v. *Shorb*, 24 Wend. 458; *Laing* v. *Butler*, 37 Hun, 144; affd., 108 N. Y. 637; *School District in Greenfield* v. *First Nat. Bank in Greenfield*, 102 Mass. 174; *Farmers & Mechanics' Nat. Bank* v. *King*, 57 Penn. St. 202.)

The learned referee is of the opinion that the plaintiff could not recover for the reason that he parted with nothing of value at the time he received the instruments upon which he brings his suit; that he first sent his money to Monson and charged him therefor in his book; that some days later Monson returned the checks and was then given credit therefor; that at that time the plaintiff received and credited the checks on a pre-existing debt against Monson, and that in consequence thereof the defendants were not precluded from interposing the defense that they had thereto, citing *Clark* v. *Gallagher* (20 How. Pr. 308); *Phœnix Ins. Co.* v. *Church* (81 N. Y. 218); *Potts* v. *Mayer* (74 id. 594).

The referee also appears to have been of the opinion that the long time intervening after the plaintiff received the checks before he presented them to the defendants for payment, furnished evidence that the plaintiff did not receive them in the regular course of business, citing *Claflin* v. *Bank* (25 N. Y. 293).

We have not deemed it necessary to consider these questions, for under the view taken by us the plaintiff is chargeable with knowledge of the agreement of Monson with the defendants, and consequently they may avail themselves of their defense the same as if the action was prosecuted in the name of Monson.

The judgment should be affirmed, with costs.

Dwight, P. J., and Lewis, J., concurred.

BRADLEY, J. (dissenting):

The plaintiff handed his certificates and money to Monson to deposit in the bank of N. M. Allen & Son. This was to be done for the plaintiff, and such was the authority and direction given by him to Monson. The purpose of the plaintiff was to have the responsibility and liability of those bankers for his money. And by their checks or bills drawn by them on themselves which came to the plaintiff he was advised that the deposits were made, that the amounts thus represented would be paid on presentation of such checks, and that until then a balance would remain in their bank to pay them. This was the import of the instruments, and the situation represented by them to the plaintiff. While the plaintiff may in the outset have intended that the money should be deposited to his own credit, he was at liberty when the bankers' negotiable checks came to him indorsed by Monson, to treat the object as practically accomplished. The purpose of Monson's authority was apparently fulfilled when he had furnished to the plaintiff such evidence of the liability of the bankers to pay the respective amounts so deposited. And the plaintiff had no reason to apprehend that those instruments were intended by the drawers to have another or different legal effect than that which they by their terms purported to give to them. But it seems that the bankers had an understanding with Monson that the checks were not to be treated as effectual for any purpose, and that he should be permitted to draw the money from the bank without the production or presentation of them. When the plaintiff afterwards presented those checks for payment to the bank, payment was refused.

The question, therefore, is whether or not the plaintiff was affected by such understanding between the bankers and Monson.

It is urged on the part of the defense that the plaintiff was chargeable with knowledge of the purpose for which the instruments were issued to Monson because the latter was his agent in the transaction of depositing the money.

The fact is that Monson had authority to deposit the money in the defendants' bank for the plaintiff and not elsewhere, and when he did that and thus secured the liability of the bankers to the plaintiff he had accomplished all that his authority from the plaintiff permitted. He, however, assumed to deposit the money as his own,

and in that manner induced the bankers to treat him as owner, and by reason of the confidence reposed by them in him and upon the pretense of a purpose suggested by Monson they delivered to him their checks in form negotiable. The purpose for which they were issued to him, if effectual, would be a fraud upon the plaintiff.

It would seem that when Monson departed from the purpose for which he was commissioned by the plaintiff to act for him, and acted for himself, he got beyond the scope of his authority derived from the plaintiff; that in making the arrangement in respect to the char-acter the bankers' checks should have he was engaged in the com-mission of an independent fraudulent act on his own account; and that notice of it was not imputable to the plaintiff, as to whom and his interest he was thus, and for his fraudulent purpose, acting adversely. (*Innerarity* v. *Merchants' N. Bank*, 139 Mass. 332; *Atlantic Mills* v. *Indian Orchard Mills*, 147 id. 268–278; *Allen* v. *South Boston R. R. Co.*, 150 id. 200–206.)

The defendant, however, having no knowledge of the relation of the plaintiff to the transaction of the deposit of the money, would not have been liable to the latter if the checks or drafts of his bank-ing firm had not been made and issued to Monson. They, as their import represented, were the negotiable undertakings to pay the amount of the deposits, and they were, as they seemed to the plain-tiff, the products of the deposit of his money in the bank. They were so received and treated by him in good faith. The trouble which has occasioned this controversy arises from the unusual and probably unprecedented action of the bankers in issuing their nego-tiable checks or bills to Monson in reliance upon his promise to retain and return them. If they had not been furnished to the plaintiff for the respective deposits of his money his remittances to Monson for that purpose would have ceased. For the bankers to say that they supposed their checks would be held by Monson is not a very satisfactory answer in a legal sense, as there was no restric-tion other than in his worthless promise that he would not let them pass from him.

The proposition that the plaintiff was chargeable with notice that the bankers made and delivered the drafts to Monson pursuant to an agreement which destroyed their validity or rendered them in effect other than that which was plainly their purport, has, as viewed by me, neither reason nor principle for its support.

The case of *Bank of United States* v. *Davis* (2 Hill, 451), much relied upon, does not seem to aid the defense.   There Williams was one of a board of directors of a branch bank of the plaintiff at Erie, Penn., and to him the bills in question were sent by the drawer for discount at that branch.   He indorsed his name upon them and procured them to be discounted for himself and appropriated the proceeds.   His associates in the board had no notice of the fraudulent use of the bills, and supposed the discount was made in good faith for himself.   The court held that the bank was chargeable with notice of the fraudulent conduct of the director Williams, for the reason that the bills were transmitted to the director Williams for the purpose of having them discounted by the bank for the drawer, and that he was acting in behalf of the bank at the time of the transaction in question.   And Chief Justice NELSON, in delivering the opinion of the court, said : " But one answer has been made to the conclusion at which we have arrived, and that is that Williams should not be regarded as a director in the discount of the bills in question.   If this could be maintained then I admit the argument fails ; but we have already endeavored to show this position to be utterly untenable ; that it is not true, either in point of fact or in contemplation of law."

It was in the scope of the power of the directors to discount paper.   And the court said : " It is not to be denied that if a principal employs several agents to transact jointly a particular piece of business he is equally responsible for the conduct of each and all of them while acting within the limit and scope of their power."   In that case, while representing the bank as its director, the bills were transmitted to and received by Williams, as such director, to be discounted for the drawer, and by causing it to be done he secured an advantage to himself.   And it was held that his relation to the bank was such, in the matter of discounting the bills, that notice of the purpose for which they were received by him was imputed to the bank as the bills were discounted by it through the action of the directors.

The principle of the case, in view of the facts presented by it, is referred to and somewhat exemplified by Judge GRAY in *Casco Nat. Bank* v. *Clark* (139 N. Y. 307).

It may be observed that in the *U. S. Bank* case, Williams was

not the adverse contracting party. He was acting as its director in procuring the discount of the paper, although he may have had the purpose of realizing an advantage to himself from it. In the present case the plaintiff was chargeable with knowledge that the money was deposited to the credit of Monson. Further than that the drafts of the bankers transmitted to the plaintiff advised him that the amount remained with them subject to call on presentation of those instruments according to the usual custom and course of banking business in such cases.

The promise of Monson to retain and return the checks was made to procure them for the purpose of defrauding somebody, and the issuing them, with permission to draw the money from the bank without their production and surrender, enabled him to do so. He evidently did not care which, the bankers or the plaintiff, suffered the consequences. He knew it was only through the means afforded by the irregular and inexcusable method which the bankers consented to adopt that he could consummate his fraudulent purpose. It certainly would be a most remarkable presumption that would impute to the plaintiff notice that the bankers did not intend that their checks should have the character of their import.

In *Allen* v. *South Boston R. R. Co.* (150 Mass. 206), after stating the general rule of constructive notice to the principal of facts within the knowledge of the agent affecting the character of the transaction while acting for him, the court added : " There is an exception to this rule when the agent is engaged in committing an independent fraudulent act on his own account, and the facts to be imputed relate to this fraudulent act.   *   *   *   It has been suggested that the true reason for the exception is that an independent fraud committed by an agent on his own account is beyond the scope of his employment, and, therefore, knowledge of it, as matter of law, cannot be imputed to the principal, and the principal cannot be held responsible for it.   *   *   *   Whatever the reason may be the exception is well established." And in *Innerarity* v. *Merchants' N. Bank* (139 Mass. 332), upon the subject of the reason for the exception to the general rule, the court observed : " While the knowledge of an agent is ordinarily to be imputed to the principal, it would appear now to be well established that there is an exception to the construction or imputation of notice from the agent to the principal in case

of such conduct by the agent as raises a clear presumption that he would not communicate the fact in controversy, as where the communication of such a fact would necessarily prevent the consummation of a fraudulent scheme which the agent was engaged in perpetrating."

It may be stated as a theory or ground upon which notice is imputed to the principal of facts which come within the knowledge of the agent, while acting in the scope of his authority, that the duty of the agent is to communicate such facts to his principal, and the presumption is that he had done so. (*C. N. Bank* v. *Clark,* 139 N. Y. 307–313.)

When the agent is attempting to do that which if effectual would be a fraud upon his principal, the presumption that he has communicated to or will advise him of the facts of the transaction certainly cannot be presumed, nor can it be assumed by the person with whom the agent is dealing that such purpose or conduct of the agent is within the scope of his authority. It is quite evident that if N. M. Allen & Son had been advised that Monson was acting for the plaintiff in depositing the money, it would have been apparent to them that an arrangement to the effect that the checks should be nugatory as such, and for that reason Monson might draw out the money without the presentation of them, would be in fraud of the plaintiff, and, therefore, not within the scope of his authority to Monson.

The proposition upon which the defendants seek to charge the plaintiff with constructive notice, being that of agency and his relation of principal, is for the purpose of the question not other than it would be if the bankers had then known that Monson was acting for the plaintiff in depositing the money.

And it seems quite clear that no support for the defense can be founded upon imputation of notice to the plaintiff arising out of the relation of agency, because the very nature of the understanding, to the effect that the checks or drafts were to be deemed nullities, was such as to advise the bankers that it was not within the scope of the agency of Monson to fraudulently defeat the purpose of the authority given him by the plaintiff.

So far, therefore, as the defendants seek to defend upon the ground of constructive notice to the plaintiff arising out of the agency

of Monson, they must assume the consequences which would have resulted from their knowledge of that relation as of the time of the transactions in question.

It seems to follow that the defense has no support in the position that notice was imputed to the plaintiff that the bankers' checks were made pursuant to an understanding, fraudulent on the part of Monson, which would defeat their apparent purpose and effect as such.

The plaintiff received those instruments for value, and is a holder of them in good faith.

They in fact were the product when made of his money deposited, and were transmitted to him as such. By them was expressed the liability and undertaking of the makers to pay the respective and equivalent amounts so deposited with the bankers who made them. The plaintiff was at liberty to assume that the liability to pay them would continue until they were presented for payment. This, as between them and the plaintiff, the bankers were in view of the usual methods and course of business required to understand. No reason appears for apprehension on the part of the plaintiff to the contrary. Nor is it seen that the indiscreet and remarkable confidence of the bankers in Monson's promise to return the drafts can legitimately be available to prejudice the plaintiff's claim founded upon them.

For these reasons, being unable to concur in the opinion adopted by a majority of the court, I think the judgment should be reversed and a new trial granted, costs to abide the event.

Judgment appealed from affirmed.