NORMAN M. ALLEN, Respondent, *v.* HIRAM F. HENRY, Appellant.

*Agency — facts insufficient to constitute a payee of notes the agent of the maker to raise money upon them — when a judgment will be reversed upon the facts.*

A judgment should not be reversed upon the facts unless the proofs so clearly preponderate in favor of a contrary result as to make it reasonably certain that the trial court erred in its conclusion.

In an action brought to recover upon two non-negotiable promissory notes, it appeared that the maker of the notes had constituted the payee his agent to deposit his moneys with a banking firm, and supposed that he had a large sum on deposit with that firm ; that the maker needing money, and proposing to draw on his deposit with the banking firm, the payee, who had deposited in his own name the maker's moneys, not wishing the maker to draw on the banking firm, as it might have disclosed the fraud of which the payee was guilty, proposed to let the maker have the requisite money, and procured a draft from the banking firm, for which he received one of the non-negotiable notes in question (which the payee, in effect, said would never be negotiated), and transferred it, by assignment only, to the banking firm as payment for their draft. There was evidence in numerous letters written by the maker to the payee of the note that the maker considered himself indebted to the payee by reason of the loan. The second note was given to represent an overdraft of the maker at his bank, which was paid by the payee of the note.

In an action brought by an assignee of the payee to recover the amount of the notes,

*Held,* that the trial court was not justified in finding that the payee was, in respect to these notes, the agent of the maker, and that they had been delivered to him in order that the payee should, as the maker's agent, raise moneys upon them.

APPEAL by the defendant, Hiram F. Henry, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Cattaraugus on the 26th day of August, 1895, upon the decision of the court rendered after a trial at the Cattaraugus Circuit, the jury having been dismissed by consent of all parties.

The plaintiff brings this action to recover upon two promissory notes, of which the following are copies :

"GOWANDA, *July* 30, 1889.

"On demand I promise to pay to F. Monson three thousand dollars, with interest, for value received.

"(Signed)    H. F. HENRY."

" GOWANDA, N. Y., *Sept.* 25, 1889.

" On demand I promise to pay F. Monson one thousand dollars, with interest, for value received.

"(Signed) H. F. HENRY."

The complaint alleges that at the time these notes were made the payee, F. Monson, was the agent of the defendant; that the notes were delivered to Monson, as such agent, for the purpose of raising money thereon for the defendant; that he did sell, assign and transfer the same to the plaintiff's firm, and as such agent receive the avails thereof, which he immediately thereafter delivered to the defendant.

The allegation of agency was denied by the defendant's answer, and an indebtedness from Monson to the defendant was also alleged by way of counterclaim to the plaintiff's cause of action.

The issues thus joined were brought to trial at the Cattaraugus Circuit in May, 1895, and at the close of the evidence both parties moved for the direction of a verdict; thereupon the court, with the consent of counsel, discharged the jury, and, after further deliberation, handed down a decision in favor of the plaintiff for the full amount of both notes. Upon this decision judgment was subsequently entered, and from that judgment this appeal is taken.

*John G. Milburn* and *Sherman S. Rogers*, for the appellant.

*Frank W. Stevens* and *William H. Henderson*, for the respondent.

ADAMS, J.:

The facts of this case constitute a chapter in the history of certain financial transactions, so remarkable in many of its features as to force upon the mind of one who reads the evidence the conviction that when a shrewd, adroit knave undertakes to perpetrate a swindle, there is really no limit to his assurance, and that the greater the audacity displayed the easier it becomes for such a person to find a victim.

Inasmuch as a proper determination of the single question presented by this appeal renders necessary a careful examination of the evidence taken upon the trial, it will perhaps prove instructive as

well as interesting to recapitulate some of the principal incidents of this extraordinary history.

The defendant is the proprietor of a traveling minstrel company, which he accompanies while upon the road, and he is thus occupied the greater part of each year. His home during the period covered by this history was in the little village of Gowanda, in the county of Cattaraugus, and there he spent some portion of each summer while his troupe was not exhibiting.

Some time about the year 1883 a man calling himself "Forbes Monson" took up his residence at Gowanda, and in a short time insinuated himself into the good graces of the citizens of that place to such an extent that he was regarded by them as not only a man of strict integrity, but also as one of vast experience, whose judgment and advice in business matters were well nigh infallible.

Soon after coming to Gowanda, Monson made the acquaintance of the defendant, and in a short time had gained his unlimited confidence and esteem. At this time the defendant had accumulated some little means and kept a very respectable account with the bank of Gowanda.

A few miles from Gowanda was the village of Dayton, at which the plaintiff carried on business as a private banker in company with his son, under the firm name of Norman M. Allen & Son. Shortly after the acquaintance between Monson and Henry had ripened into intimacy, the former began to express doubts to the latter as to the soundness of the bank of Gowanda, and at the same time took great pains to speak favorably of the financial standing of Allen & Son. It, of course, became only a matter of time when Henry should entertain similar views, and consequently, in February, 1886, we find him writing Monson that he too was getting concerned about the Gowanda bank.

This was, apparently, just what the confidential friend had been waiting for, and he immediately answered the defendant's letter, offering to withdraw the latter's money from the Gowanda bank and transfer it to the banking house of Allen & Son, remarking incidentally that when Henry's deposit amounted to $5,000 he would obtain "a strictly first-class permanent investment" for him.

It is needless to say that this proffer of friendly service was readily accepted by Henry, and that his certificate of deposit in the

Gowanda bank was immediately forwarded to Monson, who cashed the same and sent Henry his check for the amount therefor on Allen & Son, apologizing for its not being certified, and saying that this little formality would not be overlooked in the future. A second certificate forwarded by Henry was cashed by the Gowanda bank and the avails deposited by Monson to his own credit with Allen & Son.

At this point in the history we are made acquainted with a feature of the banking business which is novel, to say the least, for, instead of furnishing Monson with a certificate for the amount thus deposited, Allen & Son drew their check therefor upon themselves, to Monson's order, and this check was subsequently indorsed by Monson and forwarded by him to Henry as evidence of Monson's good faith and financial ability; which purpose it seems to have served most acceptably.

Thereafter, Henry, from time to time, forwarded drafts to Monson, which were deposited in like manner with Allen & Son, and similar checks were mailed to Henry until a fund of some $28,000 had been accumulated, which was represented by thirty-three of these checks. While Monson's bank account was in this manner being augmented by the defendant's accumulations, a regular correspondence by letter was kept up between the parties, in the course of which Monson gave Henry the benefit of his superior financial ability and experience, in the way of advice, as to the necessity of devoting every dollar of his surplus earnings to the amplification of his capital, at the same time assuring him that he would soon be the possessor of an independent fortune, and that the money deposited with Allen & Son was, by a special arrangement, drawing interest at the rate of six per cent, for the payment of which Monson kindly made himself personally responsible.

During all of the time that Henry was thus remitting moneys to Monson, and the latter was depositing them to his own credit with Allen & Son, it does not appear that the defendant took the trouble to write his supposed bankers or to make any inquiry as to the condition of his account. He seems to have had no occasion to draw upon it, for, as will appear later on, Monson was always ready to advance the defendant money when the necessity arose for the use of any extraordinary sum; and so far as the evidence

discloses, Allen & Son had no knowledge that the defendant had any interest in the moneys thus deposited.

The time came, however, when the defendant began to realize that the security of this banking firm was hardly adequate, even with his friend's indorsement, for the amount which he supposed had been deposited to his credit, and consequently, under date of October 26, 1890, he wrote Monson expressing his uneasiness and dissatisfaction with the situation and his desire for some safer and more permanent investment.

It appears that prior to this time Henry had embarked in a theatrical venture, which required some ready money, and he proposed to have some of these Allen checks cashed in order to obtain the same ; but this he was advised by Monson would be the height of folly, inasmuch as the moneys on deposit were drawing a good rate of interest, and that it would be much better for the defendant to procure what funds were then needed by means of a temporary loan. To Henry's uncultured financial mind this did not seem quite the proper thing to do, but he finally yielded to Monson's persuasive counsel, and the result was the giving of the notes in suit.

This, without going into minute details, is a brief outline of the remarkable relations existing between these several parties, which, it is hardly necessary to add, terminated in the manner which might be expected.

In February, 1891, it was discovered that Monson had changed his residence from Gowanda to some unknown place, and, of course, the whole of Henry's $28,000 departed with him.

When this fact became known Henry presented his checks to Allen & Son ; payment was refused, and shortly thereafter suit was brought thereon. This suit was defended, and after a trial before a referee the defendants obtained judgment, which was subsequently affirmed by the General Term (77 Hun, 49), and later on was reversed by the Court of Appeals. (151 N. Y. 1.)

In the meantime the plaintiff, learning of Monson's death, and having obtained an assignment of his son's interest in the notes, brought this action, which, it seems, has been twice tried. Upon the first trial the plaintiff was nonsuited, but the judgment entered

thereon was subsequently reversed by the General Term (81 Hun, 241) upon the ground that, as the evidence then stood, there was sufficient to warrant the jury in finding that in his relation to the notes in suit Monson was the agent of the defendant. A second trial followed, with the result already indicated. And the only question in the case which is presented by this appeal is one of fact, and the one which has been the subject of this controversy from the outset, viz., that of Monson's relation to the transactions surrounding the execution and assignment of the notes in suit.

We approach the consideration of this question with some hesitation because of the well-recognized rule that before a judgment can be reversed upon the facts of a case it must appear that the proofs so clearly preponderated in favor of a contrary result to the one reached as to make it reasonably certain that the trial court erred in its conclusion. (*Baird* v. *Mayor et al.,* 96 N. Y. 567; *Aldridge* v. *Aldridge,* 120 id. 614.)

Our embarrassment is relieved to some extent, however, by reason of the fact that the conclusion of the learned trial justice apparently rested upon the assumption that he was, in a large measure, concluded by the decision of the General Term in this case as well as in the case brought by Henry against Allen, for in his opinion he says that the facts of the present case " are interlinked with the action of *Henry* v. *Allen* (77 Hun, 49)," in which action " it was held that Monson, in his dealings with the banking firm of Allen & Son, was the agent of Henry."

Since this opinion was written the judgment in the case last cited has, as already appears, been reversed by the Court of Appeals, where it was held that Monson was merely " an agent to deposit moneys for the plaintiff (defendant) with the defendants (plaintiff) and to procure their checks therefor, which he was to indorse and deliver to the plaintiff (defendant)." (See opinion of VANN, J., in 151 N. Y. 11.)

This, we think, is by no means conclusive upon the question of agency. as it arises in the case in hand, and, therefore, we feel at greater liberty to review and determine the facts now presented to us than we otherwise would.

At the last trial the defendant was permitted to testify in his own behalf; and, although some question was raised as to the compe-

tency of his evidence, we do not feel called upon to consider that question, inasmuch as it was decided in favor of the defendant.

The testimony of the defendant is direct and positive; and he says that while at home in the summer of 1889, engaged in making preparations for the approaching season, Monson had a conversation with him in which he inquired if he, the defendant, would not require considerable money, and when informed that such was the case, stated that he would let him have what he needed. Henry replied that he did not feel like getting it of him, as he had resources of his own, referring, undoubtedly, to the deposit which he supposed he had in the plaintiff's bank. But for reasons which are quite obvious, Monson did not wish the defendant to draw upon that fund, and insisted upon loaning him whatever he required for the ensuing season; and upon being informed that $3,000 would answer, said he would have that sum ready for him on the following day.

True to his promise, Monson appeared at the defendant's office about noon of the next day with a draft for the amount named, when a further conversation ensued between the parties, which resulted in the drawing up and execution of the first of the notes in suit and its delivery to Monson in exchange for the draft, Henry remarking that he would not give a negotiable note to any man; to which Monson replied that it made no difference, as the note " will never see the light of day."

This, it is true, is the version of an interested party; and, to some extent, it is contradicted by the evidence of the plaintiff. But the latter's relation to the transaction was very slight, as all the negotiations in regard thereto took place between Monson and the plaintiff's son, both of whom died prior to the trial of this action.

There is, however, much additional evidence in the case in the way of letters, which tends very strongly to corroborate what is testified to by the defendant. It appears that the last remittance to Monson for deposit was inclosed in a letter dated September 28, 1889, which contained this significant language: " *   *   *   I very much appreciate your offer to let me have the money for this new venture, but how absurd it would be to borrow from you when I had means of my own. *   *   * "

And reference will be made later on to other written evidence of the same character.

When the second note in suit was given, the defendant was on the road with his company. Writing from Wheeling, W. Va., under date of September 20, 1888 — which, it seems was an error, and should have been "1889" — the defendant says: "I received word from the bank (that is, the Gowanda bank) that I had overdrawn $1,000, and the fact simply resolves itself as to whether I had better let it remain so, or draw the money and pay it up. I am of the opinion that it is best to pay it, and I herewith wish that you pay Leonard the currency and take his receipt therefor, and I will send note or return one of the checks I hold."

This letter was replied to by Monson on the twenty-third of the same month in the following language, viz.: "I received yours from W. Va. Saturday evening, and on this Monday morning I paid Mr. Leonard $1,000 currency for you, as you will notice by the enclosed receipt from him. It being near the 1st of October, I send you below a statement:

Int. on $28,000, 3 mo.................................... $420 00

| | | | | | | |
|---|---|---|---|---|---|---|
| Dr. Int. on $3,000 | from | July 30, | 32 days | ....... | $31 00 | |
| " on 1,000 | " | Aug. 27, | 24 " | ....... | 5 67 | |
| " on 500 | " | Sept. 11, | 19 " | ....... | 1 58 | |
| " on 1,000 | " | Sept. 23, | 7 " | ....... | 1 17 | |
| | | | | | 39 42 | |

Bal. of int. in your favor........................ $380 58

"Now deduct $350.58 from $1,000 and the balance will be $619.42, am't of note you want to send me for the $1,000 in cash I paid Leonard, and that brings everything up to Oct. 1st."

These letters were followed by others, in one of which, dated September twenty-fifth, and obviously written before Monson's letter of the twenty-third had been received, the defendant says: "I received to-day from I. R. L. his check, amount $1,000, same having been paid him by you, and for which amount I herewith inclose my note on demand."

And, again, on the twenty-seventh of September, after receiving Monson's letter, he writes as follows: "Received yours 23rd and noted. I had before sent you my note for $1,000, but am willing to arrange the matter in any way you think fit."

In replying to the defendant's letter of the twenty-fifth, Monson writes: " Yours of 25th inst., with your note of $1,000 enclosed, at hand. I will endorse on the note $380.58-100; that will leave the balance of the note $619.42-100, as it should be to bring everything up trim to October 1st."

And this correspondence, taken as a whole, shows very clearly that Monson, in compliance with the defendant's request, had paid the latter's overdraft of $1,000 at the Gowanda bank; that he then wrote the defendant to send him his note for the balance due him, which appears in the statement contained in Monson's letter of September twenty-third, but that Henry had anticipated this request by forwarding a note for the full amount, which Monson agreed to reduce by indorsement, but which promise was never fulfilled.

In this connection, it is to be observed that Monson, in his statement contained in the letter of September twenty-third, charges Henry with interest on his $3,000 note from July thirtieth to October first, which as has been shown, was to have been paid by indorsement on the last note, and which Henry supposed was thus paid.

We now turn to some further correspondence relating to one or both of these notes. Under date of December 11, 1869, the defendant thus writes Monson : " I have been thinking about the notes you hold of mine, and I think it is better to cancel them and reduce my credit."

On the twenty-sixth of the following March, Monson sends the defendant a statement of his account, in which he charges himself with interest on Henry's deposit, of $28,000, and credits himself with interest on $5,119.42, which sum doubtless embraces the two notes in suit, with others. The balance in the defendant's favor of $344.96, shown by this statement, Henry, under date of March 28, 1890, directs Monson to credit on his " note account."

Later on, and under date of October 26, 1890, we find the defendant again writing Monson that he wished to take up " all the notes you hold against me and turn over enough of the checks I hold to refund them ; " and that he will arrange with Leonard, the cashier of the Gowanda bank, " to take up the notes and turn over to you the checks sufficient to cover them."

Inclosed in this letter was a written direction to Leonard to use enough of the defendant's checks, which it appears had been placed

in an envelope and intrusted to Leonard for safe-keeping, to pay all the notes held by Monson.

It is also made to appear, by evidence which is quite convincing, that the notes referred to in these various letters, must of necessity have embraced the two notes in suit, for there is no evidence that without them the defendant's indebtedness to Monson on account of borrowed money amounted to anything like the sum named in the statement of March twenty-sixth, while the statement of September twenty-third shows the specific items which entered into such indebtedness, including these notes.

The genuineness of the letters from which the foregoing extracts have been taken does not seem to be questioned, and it, therefore, only remains to determine what construction shall be given them.

In this connection it may be assumed, as an adjudicated fact, that for certain purposes, Monson was undoubtedly the agent or "middleman" of the defendant; but did that relation extend to, and cover, the transactions which resulted in the execution and assignment of the notes in suit?

If so, what reasonable explanation can be given of the fact that the notes are non-negotiable in form? Certainly, if Henry had simply made them to raise money upon, he would have been quite apt to draw them payable to the order of Monson, who would undoubtedly have indorsed them rather than permit Henry to learn, as he surely would, had he attempted to draw upon the funds which he supposed stood to his credit in the Allen bank, that his quandom friend and confidential adviser was simply an adroit and accomplished rascal.

Again, if Henry did not suppose that the money represented by these notes had been actually loaned by Monson, why was he repeatedly writing the latter in regard to "the notes you hold of mine," and paying or proffering him the interest thereon? There can be, in our opinion, but one rational answer to these questions, and that is whatever relation Monson may have borne to Henry in other transactions, in these which we have been considering he certainly was not regarded by the latter otherwise than as a friend whose counsel and advice might be safely followed.

An attempt is made upon the part of the plaintiff to weaken the force of the evidence, to which reference has been made, by quot-

ing extracts from other letters written by the defendant, which, it is claimed, are somewhat inconsistent and contradictory in their character. But these extracts, when read in connection with their several contexts, we think, tend to strengthen rather than weaken the defendant's contention. And the same may be said of a similar effort to contradict the defendant's evidence in this case by his testimony in the action brought by him against Allen.

We have examined the entire evidence contained in the printed record, and have endeavored to read it carefully and understandingly, and, when we come to consider the same in connection with the very significant fact that these notes were non-negotiable, we are convinced that, relieved of all embarrassment by reason of former decisions, the proofs so clearly preponderate in favor of the result to which our investigation has led us as to enable us to say, " with a reasonable decree of certainty that the trial court erred in its conclusion."

It follows, therefore, that the judgment appealed from must be reversed and a new trial ordered, with costs to abide the event.

All concurred.

Judgment reversed on the facts and a new trial ordered, with costs to abide the event.