HIRAM F. HENRY, Appellant, *v.* NORMAN M. ALLEN, Respondent.

1. PRINCIPAL AND AGENT — IMPLIED KNOWLEDGE — FRAUD. A principal is not chargeable by implication with knowledge acquired by his agent when engaged in a scheme to defraud the principal, nor is he chargeable with constructive notice of the circumstances under which the agent acted in the prosecution of such scheme.

2. ABANDONMENT OF AGENCY. When an agent abandons the object of his agency and acts for himself by committing a fraud for his own exclusive benefit, he ceases to act within the scope of his employment and to that extent ceases to act as agent.

3. AGENCY TO DEPOSIT MONEYS — AGREEMENT BY AGENT NULLIFYING LEGAL EFFECT OF BANKER'S CHECKS NOT IMPUTABLE TO PRINCIPAL. If an agent to deposit moneys of his principal with a banker and to procure the banker's checks therefor, which he is to indorse and transmit to his principal, deposits the moneys to his own credit, without disclosing his agency, and, in order to defraud his principal for his own benefit by checking against the deposits, secretly agrees that the banker's negotiable checks issued as memoranda of the respective deposits, and made payable to the agent's order under the supposition that he was acting for himself alone, should not take effect according to their legal import, but should be returned to the banker without delivery thereof to any one, the presumption which would otherwise arise, that he disclosed such agreement to his principal, is destroyed by both the adverse and personal character of his fraudulent act, and notice of such agreement is not imputable to the principal acting in good faith.

4. PRINCIPAL AS BONA FIDE HOLDER OF BANKER'S CHECKS ISSUED TO AGENT. If, under a general agreement between a principal and his agent, at

1

a distance from each other, that the agent shall deposit all moneys intrusted to him by the principal with a certain banker and remit to the principal the banker's checks therefor indorsed by the agent, the principal transmits checks and drafts to the agent by mail, and the agent deposits the proceeds with the banker to his own credit, without disclosing his agency, and receives negotiable cashier's checks as memoranda thereof, payable to his order on demand, under a secret agreement for his own benefit that such checks shall be returned to the banker without delivery to any one, and thereupon indorses the checks and promptly mails them to his principal, and the banker, in reliance upon the agent's agreement, permits the agent to check out the deposits while the negotiable cashier's checks are outstanding, and the principal retains the successive cashier's checks under circumstances which disprove bad faith in omitting to present any of them for payment until after all had been issued, the principal is to be deemed a *bona fide* holder of the checks and as such entitled to recover the amount thereof from the banker.

*Henry* v. *Allen,* 77 Hun, 49, reversed.

(Argued October 6, 1896; decided December 1, 1896.)

APPEAL from a judgment of the General Term of the Supreme Court in the fifth judicial department, entered May 1, 1894, which affirmed a judgment in favor of defendant entered upon the report of a referee dismissing the complaint upon the merits.

This action was originally commenced against Norman M. Allen and Hoyt M. Allen as co-partners in the business of banking at Dayton in this state, under the firm name of Norman M. Allen & Son. While the appeal to the General Term was pending Hoyt M. Allen died, and Norman M. Allen is alone respondent.

The action was founded on thirty-three written instruments for the payment of money, which for convenience are called checks, differing in dates and amounts, but in other respects like the following, the first of the series, viz. :

"$1,010.25.                    DAYTON, *March* 17, 1886.
"NORMAN M. ALLEN & SON, Bankers :
"Pay to the order of F. Monson one thousand and ten $\frac{25}{100}$ dollars.
                              "N. M. ALLEN & SON."

They were all signed by the defendants, under their firm name, and indorsed by the payee to the order of the plain-

tiff. In the aggregate, they amounted to the sum of $27,999. Each check is the basis of a separate count in the complaint, and there is a final count for money had and received. The defendants, by their answer, deny that the checks were delivered by them to the payee, or by him to the plaintiff, for a valuable consideration, and they allege that they had no legal inception or consideration, but were made and delivered to the payee at his request and for his convenience simply as memoranda, "showing the time of the receipt by him of certain items" of money deposited with them, upon his representation "that he would not part with the possession of them, but that he would in a short time return the same." They further allege that he obtained them from the defendants upon such representations with intent to defraud, and that the plaintiff knew the facts aforesaid when he received the checks.

Upon the trial, it appeared that, during the period covered by the complaint, the plaintiff resided at Gowanda in this state and had no acquaintance with the defendants, who resided four miles distant, where they carried on business as private bankers. Norman M. Allen, the senior member of the firm, had been a practicing lawyer since 1864, and a banker for eight or ten years. The plaintiff was the proprietor of a traveling minstrel troupe and his business called him from home continuously except during the summer months. Forbes Monson, the payee of said checks, had resided in Gowanda for several years prior to March 17th, 1886, the date of the first check, and was regarded by the people in that vicinity "as a man of strict integrity, good financial standing and extraordinary business experience and ability." The relations between him and the plaintiff were of an "intimate and confidential character, so much so that the plaintiff sought counsel and advice of said Monson upon substantially all of his business affairs and particularly upon the subject of saving money and making investments." For some time prior to March, 1886, the plaintiff owned three certificates of deposit issued to him by the Bank of Gowanda, one for $1,163.54 and the

other two for $1,000 each. After many conversations and much misrepresentation by Monson as to the financial condition of the Gowanda Bank, they "entered into an agreement by which the plaintiff was to deliver to said Monson said three certificates and all other moneys which he might be able to save from his said business from time to time, said certificates to be converted into money, and such money, together with such as the plaintiff might thereafter send to said Monson from time to time, should be deposited in the defendants' bank at Dayton, N. Y., by the said Monson, acting for and on behalf of the plaintiff, and the same should be kept there until such time as the amount so deposited should aggregate $5,000.00, when it was to be loaned by said Monson, for the plaintiff, to the defendant Norman M. Allen on a bond secured by a mortgage upon real estate; and as a part of said agreement the said Monson did undertake, promise and agree with the plaintiff to pay him * * * 6 per cent interest per annum on all moneys which the plaintiff should send to him for deposit with the defendants while the same should remain on deposit in said bank, and that such interest should be paid quarterly at the expiration of each and every three months. It was further agreed between plaintiff and said Monson that for the moneys so deposited the said Monson should either send the plaintiff his individual check or the check of the defendants, endorsed by himself, for the amount of each deposit that should thereafter be made. * * * and * * * that the money should be drawn from the Bank of Gowanda on one of said certificates at a time, and in such manner as would be likely to create no suspicion of where the same was to be placed, or of the arrangements or agreement between them." The defendants knew nothing of this arrangement, and the plaintiff supposed that Monson was interested in the defendants' banking business.

On the 15th of March, 1886, Monson deposited $900, being part of the proceeds of one of the certificates of deposit, with the defendants, to his own credit and thus opened a general

account with them, which continued until the month of February, 1891, and aggregated nearly $60,000, including all of the moneys sent to him by the plaintiff under the agreement between them. He took pains to see that the various sums so deposited were credited to him personally on the defendants' books, and he also received a pass book in the usual form, upon which were entered from time to time all such credits to him, as well as all his checks paid by the bank, and charged to his account. On March 16th, 1886, he sent to the plaintiff his personal check for the proceeds of the first certificate of deposit, and the plaintiff retained it until in August following, when it was paid by Monson without presentation at defendants' bank. On March 17th, 1886, Monson deposited the proceeds of the second certificate with the defendants, and at the time represented to them that the money belonged to him; that no other person had any interest therein; that he was in partnership with the plaintiff; that the sum so deposited was his share of the profits of their business, and that he wished to keep special memoranda of the moneys received from that source until he could have a settlement. The defendants offered to give him a duplicate deposit slip, but he said that would not answer his purpose. Thereupon, under the express agreement that it was without consideration or validity as commercial paper, or as an obligation against the defendants, and that it should be returned to them without delivery to any other person, and without being charged to him on the books of the bank or otherwise, the defendants, relying upon said representations and agreement, gave him the paper, dated March 17th, 1886, signed by their firm name, a copy of which has already been set forth. At the same time they gave him credit for the amount so deposited upon their books and authorized him to check it out whenever he wished. Monson thus procured said instrument with the fraudulent intent of thereafter transferring the same, and he immediately indorsed it to the order of and mailed it to the plaintiff, who received it believing that it had been given by the defendants upon the deposit of the proceeds of one of his certificates.

On the 20th of March, 1886, the said Monson, under the same agreement and upon substantially the same representations, deposited the proceeds of the third certificate with the defendants and received therefor both credit in his personal account upon the books of the bank and a written instrument in the same form as that last described, which he promptly indorsed in the same way and mailed to the plaintiff, who received it as evidence of the investment that he supposed he had made. Thenceforward until March 4th, 1889, the plaintiff on divers occasions delivered and sent to Monson drafts and currency to the amount of $25,793.14 under the agreement previously made between them, except that the loan of $5,000 to Norman M. Allen was abandoned. Monson deposited the various sums, as they were received, with the defendants to his own credit under the circumstances and upon the representations and agreement already mentioned. Credit was given to him for each sum upon the books of the bank, and a check for the same amount and in the form previously adopted, was delivered to him and by him at once indorsed and mailed to the plaintiff, who received it, believing that the defendants had delivered it to Monson as the property of the plaintiff and for his exclusive benefit. During all this time the defendants had no knowledge that the plaintiff, or any person other than Monson, had any interest in the deposits thus made. From time to time Monson also deposited moneys of his own in the same account, and those sums were credited to him in the usual way, but no check was given to him in addition. Before the defendants learned that Monson had transferred said instruments in writing to the plaintiff, they had paid out the entire amount of the deposits, including all that came from the plaintiff, upon Monson's checks, given apparently in the ordinary course of his business. None of said written instruments were charged to Monson and no record was kept of them in the defendants' bank. Pursuant to the agreement between them and down to January, 1891, Monson paid to the plaintiff interest upon all sums received for deposit with the defendants, and was

duly credited therefor upon the books of the plaintiff, which contained an account, in the form of debit and credit, of each remittance by the plaintiff to Monson and by Monson to him.

About the 12th of February, 1891, Monson absconded, and shortly thereafter the plaintiff presented the said checks for payment, but the defendants, who then learned for the first time that the plaintiff had any interest in said deposits, refused to pay the same or any part thereof. Until then the plaintiff knew nothing about the double-dealing of Monson, but supposed that he had acted honestly in all respects and that each of said written instruments was what it purported to be.

The referee found the foregoing facts in substance, and he also found that about the month of March, 1886, the plaintiff wrote to the defendants, who received the letter and showed it to Monson, but they did not produce it on the trial, claiming that it was lost. The referee refused to find that the letter referred to the deposit of plaintiff's moneys in the defendants' bank. He found, as conclusions of law, that the instruments in question had no legal inception or validity as obligations against the defendants while they were in the hands of Monson, and that the plaintiff had no better title. He directed that the complaint should be dismissed, and the judgment entered accordingly was affirmed by the General Term, one of the justices dissenting. (77 Hun, 49.) The plaintiff appeals to this court.

*John G. Milburn* and *Sherman S. Rogers* for appellant. Monson's knowledge of the purpose for which the checks were obtained by him and issued by the defendants, and that they were merely memoranda not to be transferred, is not chargeable to the plaintiff. (Pom. Eq. Juris. § 675; Mechem on Agency, § 723; *Nat. L. Ins. Co.* v. *Minch*, 53 N. Y. 144; *Cave* v. *Cave*, L. R. [15 Ch. Div.] 639; *Kettlewell* v. *Watson*, L. R. [21 Ch. Div.] 707; *Rolland* v. *Hart*, L. R. [6 Ch. App.] 677; *Thompson* v. *Cartwright*, 33 Beav. 178; *T. H. E. Co.* v. *C. E. Co.*, 65 Fed. Rep. 341; *Frenkel* v. *Hudson*, 85 Ala. 158; *Fulton Bank* v. *N. Y.*

*& S. C. Co.*, 4 Paige, 137; *Hyatt* v. *Clark*, 118 N. Y. 569; *Constant* v. *University of Rochester*, 111 N. Y. 604.) The plaintiff is a *bona fide* holder for value of the checks. (*Pollock* v. *Reardon*, 65 Fed. Rep. 848; *Leask* v. *Scott*, L. R. [2 Q. B. Div.] 376; *Harrington* v. *Brown*, 77 N. Y. 72; *McNaught* v. *McClaughry*, 42 N. Y. 25; *Greef* v. *Deckerhoff*, 22 N. Y. S. R. 282; *Weaver* v. *Barden*, 49 N. Y. 293; *Stephens* v. *Board of Education*, 79 N. Y. 187; *Mayer* v. *Heidelbach*, 123 N. Y. 332; *Roca* v. *Byrne*, 145 N. Y. 182.) The plaintiff is entitled to recover under the principle that where one of two innocent parties must suffer by the wrong of another, the one who enables such other to commit the wrong must bear the consequences. (*Moore* v. *M. Nat. Bank*, 55 N. Y. 41.)

*William H. Henderson* for respondent. Where negotiable instruments are procured by fraud, or by virtue of an agreement that they are to be mere memoranda, and not to have any inception, then the burden shifts to and rests on the holder to show that he or some one of the prior holders, have taken the same in good faith, before maturity, for full value, and in the usual course of business. (*Vosburgh* v. *Diefendorf*, 119 N. Y. 357; *Pelly* v. *Naylor*, 139 N. Y. 598; 1 Daniels on Neg. Inst. 133, § 128; Chitty on Bills [12th Am. ed.], 33; *Sherman* v. *H. R. R. R. Co.*, 64 N. Y. 254.) Upon the whole case the referee may have found, as a fact, that the plaintiff received each of these checks from Monson, knowing that they served no purpose, and knowing they were not intended to serve any purpose, other than as a memoranda showing the time and amount of each deposit made by Monson in the defendant's bank. (*Claflin* v. *Farmers & C. Bank*, 25 N. Y. 293; Edwards on Bills, 372, 373, § 519; 2 Daniels on Neg. Inst. 589, § 1572; Story on Agency, 291; *Meeker* v. *Claghorn*, 44 N. Y. 351; Wharton on Agency, §§ 464, 469.) It appears affirmatively from the findings of the referee, and from the evidence upon which these findings are predicated, that the plaintiff is not, and was not, a *bona fide* holder of the instruments

sued upon; that he did not take the same in good faith, before maturity, for full value, and in the usual course of business. (*Sackett* v. *Spencer*, 29 Barb. 180; *Howland* v. *Edmonds*, 24 N. Y. 307; *Merritt* v. *Todd*, 23 N. Y. 28; *Wheeler* v. *Warner*, 47 N. Y. 519; *Bartholomew* v. *Seaman*, 25 Hun, 619; *Herrick* v. *Woolverton*, 41 N. Y. 581; *Crim* v. *Starkweather*, 88 N. Y. 339; Edwards on Bills, 323; *Clark* v. *Gallagher*, 20 How. Pr. 308; *P. Ins. Co.* v. *Church*, 81 N. Y. 218; *Potts* v. *Mayer*, 74 N. Y. 594; *Bank U. S.* v. *Davis*, 2 Hill, 451; *Holden* v. *N. Y. & E. Bank*, 72 N. Y. 286; *Woodward* v. *R. F. Ins. Co.*, 32 Hun, 365; *Vil. of Pt. Jervis* v. *F. Nat. Bank*, 96 N. Y. 558.) Every intendment will be made in favor of this judgment. The burden of showing that there was error in the judgment appealed from is on the appellant, and the court will not search in the evidence for a fact not found for the purpose of reversing the judgment. It will only do this in order to sustain a judgment. (*E. C. F. Co.* v. *Hersee*, 103 N. Y. 25; *Day* v. *Town of New Lots*, 107 N. Y. 148.)

VANN, J. The learned General Term proceeded to judgment upon the ground that a principal is chargeable with the knowledge acquired by an agent while transacting his business, and that hence the plaintiff had constructive notice of the circumstances under which Monson procured the instruments in question from the defendants. The general rule that notice to the agent, while acting within the scope of his authority and in regard to a matter over which his authority extends, is notice to the principal, rests upon the duty of disclosure by the former to the latter of all the material facts coming to his knowledge with reference to the subject of his agency and upon the presumption that he has discharged that duty. (*Casco National Bank* v. *Clark*, 139 N. Y. 307, 313; *Hyatt* v. *Clark*, 118 N. Y. 563; *Case of the Distilled Spirits*, 11 Wall. 356, 367.) This presumption, however, does not always arise, for there are several exceptions well recognized by the authorities. Thus, when the agent has no legal right to disclose

a fact to his principal, or he is engaged in a scheme to defraud his principal, the presumption does not prevail, because he cannot in reason be presumed to have disclosed that which it was his duty to keep secret, or that which would expose and defeat his fraudulent purpose. (*Innerarity* v. *Merchants' National Bank*, 139 Mass. 332; *S. C.*, 52 Am. Rep. 710; *Weisser* v. *Denison*, 10 N. Y. 68, 76; *Frenkel* v. *Hudson*, 82 Ala. 158; *Western M. & I. Co.* v. *Ganzer*, 63 Fed. Rep. 647; *Hudson* v. *Randolph*, 66 Fed. Rep. 216; *Kettlewell* v. *Watson*, L. R. [21 Ch. Div.] 707; *Cave* v. *Cave*, L. R. [15 Ch. Div.] 639; Mechem on Agency, § 721.) As Mr. Pomeroy says in his work on Equity Jurisprudence: " When an agent or attorney has in the course of his employment been guilty of an actual fraud, contrived and carried out for his own benefit, by which he intended to defraud, and did defraud his own principal or client, as well as perhaps the other party, and the very perpetration of such fraud involved the necessity of his concealing the facts from his own client, then, under such circumstances, the principal is not charged with constructive notice of facts known by the attorney, and thus fraudulently concealed. In other words, if, in the course of the same transaction in which he is employed, the agent commits an independent fraud for his own benefit, and designedly against his principal, and it is essential to the very existence or possibility of such fraud that he should conceal the real facts from his principal, then the ordinary presumption of a communication from the agent to his principal fails ; on the contrary, a presumption arises that no communication was made, and consequently the principal is not affected with constructive notice." (§ 675). Referring to the same subject in *Weisser* v. *Denison* (*supra*), Judge ALLEN said : " The principle that notice to an agent is notice to the principal is quite familiar, but is only applicable to cases in which the agent is acting within the scope of his employment. Were it otherwise, and did it extend to acts unauthorized and outside of the employment, whether trespasses or even felonies, the master might be made responsible for all acts, whether tortious or otherwise, done by his servant, while in

his employ, or acting professedly in his behalf, if he did not act at once by disclaiming the authority. The servant would necessarily have knowledge of his own wrongful act, and within the.rule sought to be applied, the knowledge of the servant would be that of his master.   *   *   *   He would thus, by a legal fiction, be charged with the tortious, fraudulent or even felonious act   of his servant.   This is not the law." (p. 77.)

When an agent abandons the object of his agency and acts for himself by committing a fraud for his own exclusive benefit, he ceases to act within the scope of his employment and to that extent ceases to act as agent.   (*Shipman* v. *Bank of New York*, 126 N. Y. 318, 331; *Welsh* v. *German-American Bank*, 73 N. Y. 424; *Allen* v. *South Boston R. R. Co*, 150 Mass. 200, 206.)   Monson was an agent to deposit moneys for the plaintiff with the defendants, and to procure their checks therefor, which he was to indorse and deliver to the plaintiff. As a collateral arrangement he also agreed to personally pay interest upon the amount of the deposits, which neither adds to nor takes from his authority as agent.   His authorized power over the money ceased when the deposit was made. In agreeing that the checks given should not take effect according to their legal purport, and that they should be returned to the defendants without delivery thereof to any one, he was not acting as agent, but in his own behalf.   Both the adverse and the personal character of that act destroys the presumption which would otherwise arise, that he disclosed it to the plaintiff.   Not only were the relations of the agent to the subject-matter such as· to make it certain that he would not tell his principal that the checks were delivered under an agreement which nullified their effect, but the making of that agreement itself was not done by him in his character as agent, but as an individual, engaged in committing a fraud for his own benefit.

Whether this case should be regarded as an exception to the general rule, because the usual presumption as to disclosure does not exist, or simply as not covered by the rule, because

the acts in question were not within the scope of the agent's authority, we think that notice of the agreement between Monson and the defendants, that the checks should have no binding force, should not be imputed to the plaintiff. No question of apparent authority arises, because the defendants did not know Monson, as agent, but supposed he was acting for himself alone. When they invoke his agency for their protection, therefore, they are limited to his actual authority. (*Bickford* v. *Menier*, 107 N. Y. 490.) The plaintiff was, perhaps, chargeable with knowledge that the money was deposited in the name of his agent, not, however, through constructive notice springing from the law of agency, but because he knew from inspection of the checks that they were made payable to the order of Monson. While this may not have been according to the agreement under which the plaintiff intrusted the money to his agent, still, as his object was to secure the liability of the defendants, as guaranteed by Monson, the receipt of the checks, purporting to have that effect, naturally gave him every assurance that a reasonable man could require. Having the precise security that he wanted and that the agreement called for, it became a matter of no apparent importance whether the deposit was made in the one name or the other. He had what purported to be the negotiable instruments of the defendants, payable on demand, for the amount of the deposits, and this apparently placed them under obligation to pay regardless of the name of the depositor. Indeed, it was the most convenient way to have the checks drawn payable to Monson, because the plaintiff required his indorsement, and that form would make him liable as first indorser. At any rate, as the deposit was so made as to accomplish the object that the plaintiff had in view, he had the right to regard and treat it as a substantial performance of his contract with his agent. As knowledge of the secret agreement cannot be imputed to the plaintiff, he must, in view of the findings of the referee, when interpreted in the light of the undisputed evidence, be assumed to have acted in good faith. Upon this assumption it remains to be seen whether the courts below were correct in holding

that the checks had no greater validity in the hands of the plaintiff than they had while in the hands of Monson.

If Monson had simply deposited the money to his own credit and had checked it out, the plaintiff would have had no claim upon the defendants. The loss would then have fallen on him ; but it cannot be supposed that he would have continued to remit to Monson, unless the earlier remittances were satisfactorily accounted for, so that the loss would have been comparatively light. Monson, however, did account promptly for each remittance by sending the written obligations of the defendants, indorsed by himself. Those obligations were in the nature of cashier's checks, being drawn by the defendants, as bankers, upon themselves. As they were an essential part of Monson's scheme to defraud, it is natural that he should have suggested the form, but it is surprising that the defendants should have adopted it. They were not only negotiable upon their face, but their character was such as to make actual negotiation an easy matter, because they were payable on presentation at a bank, by the bank itself. No one who believed in the responsibility of the defendants and who wanted paper of that kind for any purpose, would hesitate to purchase it in the open market. The defendants, having extreme confidence in Monson, took no precaution to restrict their liability for the double credit that they gave for the same deposit. If they had drawn the checks without words of negotiability, or had written " not negotiable " across their face, it would have accomplished every purpose that Monson claimed to have in view, and at the same time would have protected third persons from imposition and injury. As memoranda, the checks would have been as useful in either of those forms as in that adopted. By action, as imprudent as it was unprecedented, the defendants placed it in Monson's power to defraud. The form of the transaction invited fraud by making it so easy, and it is not surprising that they hesitated and remonstrated before they did it. They thus, in effect, paid the deposit back to Monson and at the same time gave him their negotiable paper for it, trusting only to his word. Armed with this means of defraud-

ing, thus knowingly intrusted to him by the defendants, Monson from time to time delivered the checks to plaintiff, in fulfillment of his contract under such circumstances as could arouse no suspicion. He delivered every check as negotiable paper, with the character and quality that the defendants, over their own signatures, asserted that it had. The plaintiff received it as such, in the honest belief that it was the product of his money deposited with the defendants according to his contract with Monson, and that no one could draw the money out without presenting the checks. There was no occasion for suspicion, and nothing to put a prudent man on inquiry. It was in the usual course of business, for it cannot be termed unusual for an agent to make a deposit for his principal and remit to him the evidence of that deposit in the form of negotiable paper, such as a cashier's check, a certificate of deposit or the check of private bankers upon themselves. He treated the instruments as genuine, and why should he not, since the defendants issued them in such a form as to induce the most careful to believe in their genuineness? They had never been presented or dishonored, and he received them as soon after the dates they respectively bore as the ordinary course of transacting such business by mail would permit. The fact that the plaintiff held them so long without presentation has no bearing, except on the question of good faith, and is fully explained by the agreement made between him and his agent. No check was stale when it reached the plaintiff, and the title that he acquired as each was delivered, if good then continued to be good. He gave full consideration, dollar for dollar, not by concurrent delivery, hand to hand, but by the nearest approach to it that was practicable under the circumstances. The business was done substantially through the mails. It was initiated by a general agreement that Monson should deposit all moneys intrusted to him by the plaintiff with the defendants and remit to him their checks therefor indorsed by himself. Under this agreement the plaintiff, from time to time, mailed checks and drafts to Monson, who deposited

the proceeds with the defendants, received their check therefor, which he indorsed and promptly mailed to the plaintiff. This method of doing business, although perfectly legitimate, did not admit of delivery by the right hand and receipt by the left. In the nature of things there could not be mutual delivery, precisely indentical in point of time, when there were three parties to every transaction, each at a distance from the others. We think that the plaintiff parted with his money on the strength of the checks, although they were not in existence at the time, as there was an agreement which in the natural course of events promptly brought them into existence and placed them in his hands. If it had not done so, he could have reclaimed his money to the extent that it had not reached the possession of *bona fide* holders. (*Roca* v. *Byrne,* 145 N. Y. 182.) The assurance conveyed by the checks naturally prevented any effort at reclamation. Our conclusion is that, according to the record now before us, the plaintiff is a *bona fide* holder of the checks in question and entitled to recover the amount thereof on that ground. This makes it unnecessary to apply the principle that where one of two innocent parties must sustain a loss from the fraud of a third, such loss shall fall upon the one whose act enabled such fraud to be committed. (*Moore* v. *Metropolitan Nat. Bank,* 55 N. Y. 41, 47.)

The judgment should be reversed and a new trial granted, with costs to abide event.

All concur, except HAIGHT, J., not sitting.

Judgment reversed.