GEORGE TOWNSEND and LEWIS H. CHAMBERLIN, as Executors, etc., of ALICE S. TOWNSEND, Deceased, Respondents, *v.* MAX HIRSHKIND, Appellant. (Action No. 1.)

First Department, February 23, 1917.

**Principal and agent — liability of principal for fraud of agent committed for his own benefit.**

Where a principal intrusts money to her attorney and agent for investment in a bond and mortgage, and said agent fraudulently procures the execution of a bond and mortgage and the indorsement to him of the

check for the money to be invested by another person, for whom he also acted as attorney, the principal loaning the money may recover upon the bond and cannot be held responsible for the fraud of the agent perpetrated solely for his own benefit.

APPEAL by the defendant, Max Hirshkind, from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of New York on the 7th day of February, 1916, upon the verdict of a jury rendered by direction of the court, and also from an order entered in said clerk's office on the 9th day of February, 1916, denying defendant's motion for a new trial made upon the minutes.

*George H. Taylor, Jr. [Harry V. Morgan* with him on the brief], for the appellant.

*Louis H. Hall,* for the respondents.

DOWLING, J.:

This action was brought to recover the amount due upon a bond for $5,000, with interest thereon at five per cent from January 15, 1914, executed by the defendant to Alice S. Townsend, plaintiffs' testatrix, and bearing date January 15, 1909. By his original answer the defendant set up that the bond sued on was neither signed by him nor executed or delivered by him to Alice S. Townsend; that the purported signature thereto was a forgery, not having been made by him or by any person with his authority and consent; and that the bond itself was a forged instrument. On his application for a change of the place of trial of this action the defendant swore absolutely and unequivocally that the signature to the bond was a forgery. The defendant employed a handwriting expert to fortify himself in this denial. Upon his examination before trial, defendant, after swearing that he signed all sorts of papers for Wertheimer without knowing what they were, never refusing so to do, finally admitted that the signature to the bond in suit was his, although he could not remember the specific time when he signed any particular paper. An amended answer was interposed admitting that the signature subscribed to the bond was that of the defendant, but setting up that he had been induced to execute the same by his attorney and confidential

First Department, February, 1917.        [Vol. 176.

adviser, Louis Wertheimer, who on January 15, 1909, induced him to sign three papers, one of which was the bond in suit, another a mortgage upon an interest in the estate of one Goldenberg and the third a check for $5,000 drawn by Wertheimer to defendant's order on the Corn Exchange Bank, all of which he signed relying on Wertheimer's statements that they were documents connected with some transaction relating to property really belonging to Wertheimer and by him carried in the name of the defendant and that they involved the defendant in no personal liability to pay money, as the result of which he did not read the papers and did not know their contents or effect, Wertheimer having suppressed all knowledge of the same from him.    Upon the trial when confronted with his signature to the bond and the acknowledgment thereto taken before Wertheimer as notary public, he admitted that he had signed the bond and claimed to remember perfectly the circumstances under which he had been induced to sign it by Wertheimer. He then set forth his version of the transaction, which was that Wertheimer asked him to sign some papers, saying that he (Wertheimer) had taken a mortgage for himself in defendant's name and he wanted defendant to assign it over to him, whereupon defendant signed a paper which he claims was in blank at the time.    Under the same representations he was induced to sign two other papers, one of which is the mortgage on the defendant's interest in the Goldenberg estate and the other the check for $5,000 drawn by Wertheimer to defendant's order.    Wertheimer was the defendant's brother-in-law and the latter allowed the former, according to his own admissions, to use his name indiscriminately and served in effect as a dummy for Wertheimer in his real estate speculations in which he was evidently largely engaged, the defendant's only explanation of his submission to Wertheimer being that he was " such a bulldozer " and he " thought he was honorable."    The defendant insisted that he never knew that one of the papers he signed was a bond and that he never intended to execute a bond.    Wertheimer had been employed as attorney by Mrs. Townsend to invest $5,000 for her and she had furnished Wertheimer with the funds for such investment.    Upon the trial it appeared that Wertheimer had duly drawn a check for

$5,000, the amount of Mrs. Townsend's deposit with him, such check being drawn by Wertheimer upon his own account in the Corn Exchange Bank to the order of Max Hirshkind, the defendant, and it bore the defendant's indorsement upon the back thereof. There is no question whatever that Mrs. Townsend advanced this money; that the sum represented by this check was the money she had furnished to be invested for her; and that Hirshkind indorsed the check over and it was redeposited in Wertheimer's bank account. The bond in suit was produced by plaintiffs and offered in evidence by them upon the trial. The defendant denied knowing what the check was which he indorsed or that it was a check for $5,000. He does not seem to have had sufficient curiosity to look at what he was signing although he must have known he was indorsing his name on a check from the size and appearance of the paper; but he asked no questions and, according to his story, followed blindly the instructions and relied upon the representations made to him by Wertheimer, who, of course, is now dead. He denied any knowledge of Mrs. Townsend or any transactions with her. Numerous discrepancies appear in the defendant's testimony and many contradictions were disclosed which he was unable to explain, which, however, went to the question of his credibility. The trial court overruled the request of the defendant's attorney to have submitted to the jury certain questions of fact indicated by him and directed a verdict in favor of the plaintiffs. These questions were: *First*, did Max Hirshkind execute and deliver to the decedent, Alice S. Townsend, or to Louis Wertheimer, her agent and attorney, the bond in suit; *second*, was the bond in suit founded upon a valuable consideration therefor moving from Alice S. Townsend to the defendant, Max Hirshkind; *third*, was the execution of the bond in suit on the part of the defendant, Max Hirshkind, induced by fraud and deception practiced upon him, the defendant, Max Hirshkind, by Louis Wertheimer, the agent and attorney of Alice S. Townsend, in the matter of investing the sum of $5,000 which the plaintiff claims this bond in suit represents.

It is apparent that unless the defendant's version of his transactions with Wertheimer is insufficient to constitute a defense

to the plaintiffs' right to recover upon the bond in suit the direction of a verdict was improper and this judgment must be reversed. The manifest contradictions and falsities in defendant's testimony would affect his credibility but would not warrant disregarding it entirely. But an examination of the record satisfies us that even accepting the defendant's story as true, the facts narrated do not constitute a defense. The appellant contends that since his version of the transaction showed that he was induced to execute the bond in suit by the fraud of Mrs. Townsend's agent and attorney, Wertheimer, legal fraud imputable to her was established and her representatives are chargeable with the consequence of the false representations made by her agent, and that, as neither she nor her estate can reap the benefits of the fraud and recover upon the bond, without adopting and becoming chargeable with the fraud of Wertheimer, hence such fraud is a perfect defense upon the bond. For this proposition he relies largely upon *Garner* v. *Mangam* (93 N. Y. 642); *Krumm* v. *Beach* (96 id. 398), and *Fairchild* v. *McMahon* (139 id. 290). In none of these cases, however, nor in any other case cited by the appellant, does the fact exist that the agent in perpetrating the fraud did so for his own benefit and for the purpose of defrauding his principal. I believe this case comes squarely within the doctrine laid down in *Henry* v. *Allen* (151 N. Y. 1). In that case Henry intrusted money to one Monson for deposit at various times with the defendants, who were bankers. The agreement between Henry and Monson was that Monson should receive from Henry three certain certificates in the Gowanda Bank aggregating $3,163.54, convert them into money and with such sums of money in addition as Henry might be able to save from his business from time to time, Monson was to deposit the amounts in defendants' bank at Dayton, N. Y., acting for and on behalf of Henry and the same were to be kept there until the sums aggregated $5,000, when they were to be loaned by Monson for the plaintiff to one of the defendants on a bond secured by a mortgage on real estate. Henry and Monson agreed that for the moneys deposited with defendants Monson should send Henry either his individual check or the bankers' check, indorsed by himself, for each deposit as made. Monson

having received sums aggregating over $25,000 from Henry deposited them from time to time in defendants' bank and they were credited on defendants' books in the name of Monson and he received a pass book therefor. These deposits were made by Monson under his original agreement with Henry, the only modification in which was that the $5,000 mortgage loan was abandoned. Monson represented to defendants that he was Henry's partner, and as he wished to keep a special memoranda of the moneys received from that source until he could have a settlement, he induced the defendants to give him not only credit upon their books for the amount of his deposit and authority to check it out whenever he wished, but also for each sum deposited a check drawn by the defendants upon themselves whereby they directed payment to the order of Monson of the amount of each deposit as made. These checks Monson at once indorsed and mailed to Henry, who received them believing that the defendants had delivered the check to Monson as Henry's property and for his benefit. Defendants never knew that Henry had any interest in these deposits. Monson also deposited moneys of his own in the same account, but no checks were issued to him for those amounts. Before defendants learned that Monson had transferred the checks to Henry, they had paid out the entire amount of the deposits upon Monson's own checks against his account, given apparently in the ordinary course of business. Monson paid Henry interest upon these checks and it was not until Monson absconded and Henry presented all the checks for payment, that the bankers learned for the first time who the real party in interest was. It will be seen that in that case, as in the case at bar, the plaintiff sought to recover upon the instrument which had been procured through the fraud of his agent who at the same time was engaged in a scheme to defraud his principal, the net result and purpose of the fraud being to impose upon both sides to the transaction. In the course of his opinion Judge VANN said that the presumption that notice to an agent while acting within the scope of his authority and in regard to a matter over which his authority extends, is notice to the principal, has no application where the agent is engaged in a scheme to defraud his principal. The court said (p. 11): "When an agent aban-

dons the object of his agency and acts for himself by committing a fraud for his own exclusive benefit, he ceases to act within the scope of his employment and to that extent ceases to act as agent" (citing *Shipman* v. *Bank S. N. Y.*, 126 N. Y. 318, 331; *Welsh* v. *German-American Bank*, 73 id. 424; *Allen* v. *South Boston R. Co.*, 150 Mass. 200, 206). The court upheld the right of the plaintiff to recover, despite the fraud practiced by the agent for his own benefit, even though the plaintiff was suing upon the checks obtained by means of such fraud. The conclusion reached by them, as they said, made it unnecessary " to apply the principle that where one of two innocent parties must sustain a loss from the fraud of a third, such loss shall fall upon the one whose act enabled such fraud to be committed." (*Moore* v. *Metropolitan National Bank*, 55 N. Y. 41, 47.)

It follows that even accepting the defendant's unsatisfactory version of his relations with Wertheimer and of the means by which he was induced to sign the bond in question, the fraud then committed was a fraud perpetrated solely for the benefit of Wertheimer and for which his principal cannot be held responsible. Mrs. Townsend had parted with her $5,000 in absolute good faith and for the sole purpose of having the same invested in a valid bond and mortgage. Any scheme by which Werthimer sought to appropriate that money to his own use and benefit without giving Mrs. Townsend in return a valid bond and mortgage was for his pecuniary advantage and to her loss. If the defendant knowingly signed the bond in question and became a party to Wertheimer's scheme, of course he had no defense to the action. If, as he claims, he also was defrauded by his brother-in-law Wertheimer, that fraud was for Wertheimer's exclusive benefit, the plaintiff is not chargeable therewith and the defendant has no defense to this action.

The judgment appealed from will, therefore, be affirmed, with costs.

Clarke, P. J., Laughlin, Smith and Page, JJ., concurred.

Judgment affirmed, with costs.