MICHAEL J. BOSAK, JR., Respondent, *v.* MORRIS· L. PARRISH and Others, Individually and as Copartners, Trading under the Trade Name and Style of PARRISH & Co., Appellants.

First Department, April 5, 1929.

*William F. Unger* of counsel [*Stanley H. Fuld* with him on the brief; *Gilman & Unger*, attorneys], for the appellants.

*Edward Ward McMahon* of counsel [*William H. Hall* with him on the brief; *Graham, McMahon, Buell & Knox*, attorneys], for the respondent.

MARTIN, J. The defendants are stockbrokers trading under the name of Parrish & Co., with a membership in the New York Stock Exchange. George A. Medinger entered their employ in the year 1923, as a runner and in July, 1924, became a " customers' man." His duties among other things were to receive orders from

customers for the purchase and sale of securities and to place such orders with the defendants for execution.

The plaintiff was asked by Medinger to open an account with Parrish & Co. When Medinger solicited the plaintiff's account he told him that Parrish & Co. was an old reliable house, and that he was a "customers' man" there; that due to his connection with Mr. Nehrbas, the office manager, he would be able to have plaintiff's account well handled and might work him into a few pools they were operating.

In August, 1924, plaintiff decided to open an account with Parrish & Co., and at Medinger's request called at their office and met Mr. Nehrbas, to whom he was introduced by Medinger. The plaintiff told Mr. Nehrbas that Medinger had requested him to open an account with Parrish & Co. At this interview plaintiff was given various papers to sign, among them a power of attorney. He objected to signing this because he saw no reason for it, and Nehrbas and Medinger both told him that it was a formality necessary to the opening of the account to have someone in their office authorized to carry out his orders.

The plaintiff says that the power of attorney signed by him was in blank; that the name of Medinger was written in afterwards; that at the time the account was opened he gave to defendants two checks aggregating $8,000, both of which were made to the order of Parrish & Co. They were thereafter indorsed and collected by them.

The plaintiff began trading in the account and gave orders to Medinger to buy and sell certain stocks. During October and November, 1924, he received some purchase and sales slips but did not receive them regularly. They were delivered to him by Medinger.

In September or October he asked for a statement of his account and was told that the auditors were working on the books and that he would receive a statement shortly. In the latter part of November he received his statement and on examination noticed that there were a number of trades set forth therein which he had not authorized. These trades were in Consolidated Gas of Baltimore. He then had a conversation with Medinger on this subject and called his attention to those unauthorized trades and told Medinger that he never gave any one authority to trade in his account.

Medinger said that he knew he had no such authority but he took it upon himself to make those trades; that he thought he was making a good buy. The plaintiff told him then that it must never happen again; that he had no authority to trade in the

account without specific orders, and Medinger promised to follow plaintiff's instructions.

Trading orders were given by plaintiff in November and December, and he asked for a statement of his account at the end of the year 1924. He made the request of Medinger and was told that the auditors were working on the books but that his statement would follow shortly. He received the statement on January 20, 1925, which included all transactions down to December 31, 1924.

The plaintiff found on examination of the account that there were many trades set forth in United States Steel, Westinghouse, National Biscuit, Delaware, Lackawanna and Western Railroad Company, as well as in American Smelting and Refining Company which he had not authorized. An examination of these transactions shows that for the most part the stocks were bought and sold in and out of the account the same day. He called Medinger's attention to these trades and told him that they were unauthorized.

In January and February, 1925, plaintiff made a few trades, but he never authorized the defendants or Medinger or anybody else to make any additional purchases or sales. He received no purchase and sales slips from Medinger from the first of the year to March 18, 1925, when the account was closed, and received them all from Medinger on March 19, 1925, after the account was closed, and in one bundle, when he also received a statement of his account from February 28, 1925.

On March 16, 1925, Medinger went to plaintiff's office and told him that Parrish & Co. were asking for additional margins. The plaintiff replied that he could not see the necessity for additional margin, that his account was fifty per cent covered, and then Medinger told him that he, Medinger, had made numerous trades without instructions and without plaintiff's knowledge or consent; that he had gotten himself into difficulty with Parrish & Co.; that he had given his check for $5,000 to Parrish & Co. and that he, Medinger, could not make the check good and that he wanted to borrow $5,000 from plaintiff to make the check good, which plaintiff refused.

On March 16, 1925, Parrish & Co. wrote to plaintiff as follows: " At closing prices tonight your account with us is $35,000 below our minimum margin requirements. In the event that we do not receive from you before 10 A. M. tomorrow a minimum of $15,000 to temporarily protect your account, we will sell at the best market prices obtainable, the following securities: 300 Utilities Power & Light A; 1800 Philadelphia & Reading

Coal & Iron; 1100 Texas & Pacific Railway; 400 Baltimore & Ohio Railway.

" We will request you to consider this a tender of the securities mentioned for the approximate amount of the debit balance due, namely, $173,600."

The plaintiff replied to this letter on March 18, 1925, and called the attention of Parrish & Co. to the fact that he had given specific instructions that no purchases were to be made against his account without his consent, and that his account was fully covered. He also called attention to the fact that they had not sent him any purchase and sales slips or notices that they had bought stocks for his account.

On March twentieth he received from Parrish & Co. a statement of his account with a letter in which they for the first time rely upon the power of attorney. This letter admits that all the buying and selling orders were received by Parrish & Co. from Medinger and that notices of purchases and sales were delivered by them to Medinger, and stated that Parrish & Co. would accept plaintiff's letter of March eighteenth as a revocation of the power of attorney and would accept no further instructions from Medinger.

It is contended by plaintiff that Parrish & Co. during the time they had this account knew that Medinger was trading in and out every day and that in doing that he was using plaintiff's margins to pay commissions to defendants. These transactions were through their office. They were handled by Mr. Nehrbas on his own admission, and it was not until the margins in the account were all used by Medinger's unauthorized trades that they then directly communicated with their client.

The power of attorney was specifically revoked by the plaintiff who instructed Medinger in November, 1924, and again on January 29, 1925, that he had no authority to trade in the account, and that any authority he assumed was revoked. Parrish & Co. appear to have fully realized their obligation to plaintiff and demonstrated this completely when they made their first margin call on the account and sent the notice direct to plaintiff, although they had previously been giving the purchase and sales slips and the statements to their own employee.

In *McConnell* v. *Hellwig* (190 App. Div. 244), a case very similar to the one here under consideration, Presiding Justice JENKS, writing for the court, Second Department, considered many of the points here involved and held that the defendants were bound by a notice given to defendants' employee, who was held to be defendants' agent, and said: " There is no evidence that the defendants actually

received this notice, but if it was given to Mayhew and he did not convey it to the defendants, his failure was a breach of his duty to them, but that failure could not affect the plaintiff (*Cox* v. *Pearce*, 112 N. Y. 637, 641). Whether the plaintiff gave the notice to Mayhew depends upon the plaintiff's testimony alone. None but Mayhew could contradict him, and Mayhew was discharged by the defendants after their discovery of wrongdoings, and this record knows him no more."

In the present case we have more than the testimony of the plaintiff. We have the written admission of the agent to whom the plaintiff says he gave notice, that such notice was given to and received by him. Under the rule set forth in *McConnell* v. *Hellwig* (*supra*) there is no escape from the conclusion that notice to the agent, and Medinger was clearly the agent of the defendants, was notice to them. He was their " customers' man " and he should have stopped dealing in the account of plaintiff when he was ordered to do so. Instead he used all plaintiff's margins in paying commissions to defendants on purchases and sales.

The judgment should be affirmed, with costs.

DOWLING, P. J., and O'MALLEY, J., concur; FINCH and McAVOY, JJ., dissent.

FINCH, J. (dissenting). Even assuming the finding of the trial court that plaintiff told Medinger that he canceled the power of attorney to be sustained by the weight of the evidence, yet in my opinion the case at bar falls within the exception to the general rule that notice to the agent is to be imputed to the principal. Such rule has no application where the facts and circumstances are such as to rebut a presumption that the agent would communicate his knowledge to his principal, as where such communication would necessarily frustrate the ulterior plan or scheme in which the agent was engaged. As was said by Judge VANN, in *Henry* v. *Allen* (151 N. Y. 1, 9): " The learned General Term proceeded to judgment upon the ground that a principal is chargeable with the knowledge acquired by an agent while transacting his business, and that hence the plaintiff had constructive notice of the circumstances under which Monson procured the instruments in question from the defendants. The general rule that notice to the agent, while acting within the scope of his authority and in regard to a matter over which his authority extends, is notice to the principal, rests upon the duty of disclosure by the former to the latter of all the material facts coming to his knowledge with reference to the subject of his agency and upon the presumption that he has discharged that duty. (*Casco National Bank* v. *Clark*,

139 N. Y. 307, 313; *Hyatt* v. *Clark,* 118 N. Y. 563; *Case of the Distilled Spirits,* 11 Wall. 356, 367.) This presumption, however, does not always arise, for there are several exceptions well recognized by the authorities. Thus, when the agent has no legal right to disclose a fact to his principal, or he is engaged in a scheme to defraud his principal, the presumption does not prevail, because he cannot in reason be presumed to have disclosed that which it was his duty to keep secret, or that which would expose and defeat his fraudulent purpose. (*Innerarity* v. *Merchants' National Bank,* 139 Mass. 332; *S. C.,* 52 Am. Rep. 710; *Weisser* v. *Denison,* 10 N. Y. 68, 76; *Frenkel* v. *Hudson,* 82 Ala. 158; *Western M. & I. Co.* v. *Ganzer,* 63 Fed. Rep. 647; *Hudson* v. *Randolph,* 66 Fed. Rep. 216; *Kettlewell* v. *Watson,* L. R. 21 Ch. Div. 707; *Cave* v. *Cave,* L. R. 15 Ch. Div. 639; Mechem on Agency, § 721.) As Mr. Pomeroy says in his work on Equity Jurisprudence: ' When an agent or attorney has in the course of his employment been guilty of an actual fraud, contrived and carried out for his own benefit, by which he intended to defraud, and did defraud his own principal or client, as well as perhaps the other party, and the very perpetration of such fraud involved the necessity of his concealing the facts from his own client, then, under such circumstances, the principal is not charged with constructive notice of facts known by the attorney, and thus fraudulently concealed. In other words, if, in the course of the same transaction in which he is employed, the agent commits an independent fraud for his own benefit, and designedly against his principal, and it is essential to the very existence or possibility of such fraud that he should conceal the real facts from his principal, then the ordinary presumption of a communication from the agent to his principal fails; on the contrary, a presumption arises that no communication was made, and consequently the principal is not affected with constructive notice.' (§ 675.) Referring to the same subject in *Weisser* v. *Denison* (*supra*), Judge ALLEN said: ' The principle that notice to an agent is notice to the principal is quite familiar, but is only applicable to cases in which the agent is acting within the scope of his employment. Were it otherwise, and did it extend to acts unauthorized and outside of the employment, whether trespasses or even felonies, the master might be made responsible for all acts, whether tortious or otherwise, done by his servant, while in his employ, or acting professedly in his behalf, if he did not act at once by disclaiming the authority. The servant would necessarily have knowledge of his own wrongful act, and within the rule sought to be applied, the knowledge of the servant would be that of his master. * * * He would thus, by a legal fiction,

be charged with the tortious, fraudulent or even felonious act of his servant. This is not the law.' (p. 77.)"

In the case at bar Medinger had an incentive to trade in the plaintiff's account. It appears that he had an agreement with the plaintiff that he should receive twenty-five per cent of any profits arising out of such trades. This agreement was not disclosed to the defendants. It is apparent that Medinger had resolved to trade in the account whether with or without authority, and this ulterior purpose could not be accomplished if he informed the defendants of the revocation of his power to act as plaintiff's agent.

Looking at the case at bar from the point of view of the scope of the employment, the trial court has found as matter of fact that Medinger's authority was limited to taking orders from customers for the purchase and sale of securities and to place such orders with the defendants for execution. It was not within the scope of Medinger's employment on the part of the defendants to trade in a customer's account. This he was especially authorized to do on the part of the plaintiff under the power of attorney filed by the plaintiff with the defendants. Nor was it within the scope of Medinger's employment by the defendants to accept cancellation of the power of attorney. This fact distinguishes the case at bar from those of *McConnell* v. *Hellwig* (190 App. Div. 244) and *Eng* v. *Cammann* (85 Misc. 27). There the notice of cancellation was given to the defendants' manager, and it was held that the latter, even though regarded as receiving the notice not as manager for the defendants, but as agent for the plaintiff, when he came to transmit the orders was acting within the scope of his duties as manager of the defendants, and his knowledge was theirs. Since, therefore, the knowledge of Medinger that his power of attorney had been revoked cannot be imputed to the defendants (and the trial court has found that there was no actual notice to the defendants of such revocation), the authority of Medinger to bind the plaintiff under such power of attorney continued, and the defendants are not liable for his acts thereunder. As was said by Judge RAPALLO, in *Claflin* v. *Lenheim* (66 N. Y. 301, 305): "It is a familiar principle of law that when one has constituted and accredited another his agent to carry on a business, the authority of the agent to bind his principal continues, even after an actual revocation, until notice of the revocation is given; and, as to persons who have been accustomed to deal with such agent, until notice of the revocation is brought home to them."

I am further of the opinion that in any event the plaintiff is barred from a recovery as against the defendants because he was

guilty of gross negligence under all the circumstances of the case, in not himself advising the defendants of the cancellation of the power of attorney to Medinger. Plaintiff knew that Medinger had refused to be guided by his alleged instructions not to trade in the account unless by express authorization from plaintiff and knew of Medinger's incentive to trade arising out of the agreement to share in any profits. Plaintiff also concedes that he entertained doubts of Medinger's honesty. Under these circumstances plaintiff should not have relied upon Medinger to act upon his oral statement to Medinger that he had canceled his power of attorney, or have assumed that Medinger would inform the defendants of such cancellation. The trial court has found that the defendants acted in good faith throughout, in full reliance upon the continued existence of the power of attorney. Plaintiff's loss arose through no negligence or breach of duty on the part of the defendants, but solely out of plaintiff's own negligence.

For the reasons first stated, however, the judgment as matter of law should be reversed and the complaint dismissed.

McAvoy, J., concurs.

Judgment affirmed, with costs.