Breitel, J.
(dissenting). The primary question is whether a bank which issues a cashier’s check at the request of a customer, Allied, to the order of a named payee and then allows the check to be returned by Allied for cancellation without the payee’s indorsement, accepts the risk of loss where the check was delivered to the payee and then stolen. Although the question is presented in novel circumstances, its resolution is dictated by the application of standard principles governing negotiable instruments. There are subsidi *232 arv, albeit significant, questions (factual in nature) whether the payee, Bunge, authorized redelivery of the checks to Allied, either by actual authorization of its employee or through knowledge by responsible officials of the employee’s unauthorized redelivery.
The Banking Law Journal, a specialized periodical, with a continuous history since 1889, has this to say on the principal issue: “When a person purchases from a bank a draft, payable to the order of a third person, and returns later to the bank with the draft, unindorsed by the payee, requesting that the draft be canceled and the money paid for it refunded, what course should the bank pursue? The answer depends upon whether the draft has, in the meantime, been delivered to the payee. Before canceling the draft and returning the money, the bank should ascertain whether such delivery has been made. It is possible in a case of this kind for the purchaser to deliver the draft to the payee and thereafter wrongfully regain possession of it. If the bank finds this to be the situation, it should refuse to cancel the draft. By paying the draft in such circumstances the bank would render itself liable to the payee. But if the bank finds that the draft has never been delivered to the payee, or his authorized agent, it will incur no liability in canceling the draft as requested. If it can get no satisfactory information on the point it should, for its own protection, refuse to cancel.” (Cancellation of Bank Draft at Request of Purchaser, 40 Banking L. J. 527 [1923]).
The issue in this case arises out of the fraudulent scheme -concocted by Allied Crude Vegetable Oil Refining Corporation. Allied obtained quotations on edible oil futures from plaintiff Bunge Corporation. Allied then purchased cashier’s checks, 12 in all, from defendant Manufacturers Hanover Trust Company payable to Bunge using an “ account ” maintained for a small correspondent bank, First National Bank of North Bergen. The cashier’s checks were then delivered to Bunge in exchange for warehouse receipts for the edible oil. They were turned over by responsible Bunge officials to the head cashier, Mr. Caterina, for deposit in Bunge’s bank accounts. Instead of depositing them, Caterina gave them to an Allied messenger in exchange for ordinary Allied *233 checks in the same amounts. Allied returned the unindorsed cashier’s checks to Manufacturers, in each instance on the same day they were issued. Manufacturers, according to instructions from North Bergen, recredited North Bergen’s account, which represented only a check crediting scheme, not deposited funds. Meanwhile, after some delay, Caterina deposited the ordinary Allied checks. Twelve such cashier’s checks were thus manipulated, aggregating $17,533,818.20. Returned for insufficient funds were the last three substituted ordinary checks aggregating $3,040,386.60, representing the amount in suit.
The cashier’s cheeks, issued and delivered to the payee, Bunge, were negotiable instruments (Negotiable Instruments Law, §§ 2, 20; Uniform Commercial Code, § 3-104, subd. 1; Henry v. Allen, 151 N. Y. 1, 13-14; Bobrick v. Second Nat. Bank, 175 App. Div. 550, 552, affd. 224 N. Y. 637; Rose Check Cashing Serv. v. Chemical Bank Co., 43 Misc 2d 679, 681; 41 N. Y. Jur., Negotiable Instruments, § 17; 10 C. J. S., Bills and Notes, § 5, pp. 409-410; Deones v. Zeches, 212 Minn. 260, 263). All the special rules governing negotiable instruments designed to make them a secure and efficient medium of exchange, therefore, apply.
If other conditions are satisfied, a payee may be a holder in due course (Saale v. Interstate Steel Co., 27 A D 2d 1, 3-4, and cases cited, affd. on opn. in App. Div. 19 N Y 2d 933; Ann., Payee — Holder in Due Course, 2 ALR 3d 1151, 1164-1165, 1177-1181, and cases cited; see Uniform Commercial Code, § 3-302, subd. 2, Official Comment 2). There is no dispute that Bunge received delivery of the cashier’s checks and by exchanging the checks for warehouse receipts it paid value. Hence, upon delivery of the checks, if without notice of any defect, Bunge became a holder in due course (Negotiable Instruments Law, § 91; see Uniform Commercial Code, § 3-302, subd. [1]).
Since the cashier’s checks were payable to the order of Bunge, they could be negotiated only with Bunge’s indorsement, completed by delivery (Negotiable Instruments Law, §§ 60, 79; Queensboro.Nat. Bank v. Kelly, 48 F. 2d 574, 576, cert. den. 284 U. S. 620; 41 N. Y. Jur., Negotiable Instruments, §§ 250, 301; cf. Wangner v. Grimm, 169 N. Y. 421, 428; Goshen *234 Nat. Bank v. Bingham; 118 N. Y. 349, 354-355; see, for later rule, in accord, Uniform Commercial Code, § 3-202, subd. 1). In general, possession of order paper by someone other than the payee without indorsement does not give the possessor even the presumption of ownership (Price v. Brown, 98 N. Y. 388, 393-394; 41 N. Y. Jur., Negotiable Instruments, § 301). In any event, no subsequent possessor of the checks could be a holder in due course without Bunge’s indorsement (Negotiable Instruments Law, § 79; Wangner v. Grimm, 169 N. Y. 421, supra; Goshen Nat. Bank v. Bingham, 118 N. Y. 349, supra; Queensboro Nat. Bank v. Kelly, 48 F. 2d 574, supra).
As stated in the Goshen Nat. Bank case (118 N. Y. 349, supra): “It is too well settled by authority, both in England and in this country, to permit questioning, that the purchaser of a draft, or check, who obtains title without an indorsement by the payee, holds it subject to all equities and defenses existing between the original parties, even though he has paid full consideration, without notice of the existence of such equities and defenses [citations omitted].” (118 N. Y., at pp. 354-355). Despite the fact that Allied gave value for the cashier’s checks, Manufacturers was, in effect, because of the form of the checks, both the drawer and drawee (Bobrick v. Second Nat. Bank, 175 App. Div. 550, 552-553, supra; Rose Check Cashing Serv. v. Chemical Bank Co., 43 Misc 2d 679, 681, supra; Ross v. Peck Iron & Metal Co., 264 F. 2d 262, 269; National Newark & Essex Bank v. Giordano, 111 N. J. Super. 347; State ex rel. Babcock v. Perkins, 165 Ohio St. 185, 187-188). Once the cashier’s checks were delivered to Bunge, Allied had no further rights in them; thus, Allied had no power to stop payment (Bobrick v. Second Nat. Bank, 175 App. Div., at p. 553; 41 N. Y. Jur., Negotiable Instruments, § 30; National Newark & Essex Bank v. Giordano, 111 N. J. Super. 347, supra). Allied’s rights, and through Allied, Manufacturers’ rights, depended upon the validity of the negotiation of the cashier’s checks from Bunge to Allied. When Allied “returned” the checks and Manufacturers credited North Bergen’s account, Manufacturers took the checks subject to any defense Bunge might have against Allied. Assuming that Bunge’s agent, Mr. Oaterina, stole the checks and that Allied took tfoe checks *235 from Mm, under the rule stated Manufacturers is liable for Bunge’s loss. This is true even absent notice of any defect in Allied’s title, including lack of notice of delivery to Bunge.
Stating the rule another way, a thief has no power to convey to the drawee bank good title to order paper. The thief must indorse the check in order to negotiate it (Negotiable Instruments Law, § 60). If the thief were to forge Bunge’s indorsement the drawee accepts the indorsement at its peril (e.g., Henderson v. Lincoln Rochester Trust Co., 303 N. Y. 27, 33; Fitzgibbons Boiler Co. v. National City Bank, 287 N. Y. 326, 334; American Sur. Co. v. Empire Trust Co., 262 N. Y. 181, 185, rearg. den. 262 N. Y. 635; Shipman v. Bank of State of N. Y., 126 N. Y. 318, 328; 5 N. Y. Jur., Banks and Trust Companies, § 359; 42 N. Y. Jur., Negotiable Instruments, § 503; 5B Michie, Banks and Banking, § 276; 9 C. J. S., Banks and Banking, § 358, p. 773; see Uniform Commercial Code, § 3-419, subd. [1], par. [c], and Official Comment 3). A drawee bank may escape liability if the drawer’s negligence enables the wrongdoer to impose on the bank (e.g., Gutfreund v. East Riv. Nat. Bank, 251 N. Y. 58, 62-63). Manufacturers, however, was in tMs instance the drawer.
The bank seeks to' make much of its assertion that allowing cashier’s checks to be returned comports with usual banking practices. Banks, however, continually bear the risk of honoring a check with a forged indorsement or wrongfully dishonoring a check. Indeed, this is the very nature of order paper, and the applicable principles are based on commercial practice and necessity.* They do not allow ad hoc evaluations of irrelevant considerations contradictory of banking responsibility in commercial transactions. “It is on the faith of tMs rule that business in this country is conducted” (Gallo v. Brooklyn Sav. Bank, 199 N. Y. 222, 226; quoted in American Sur. Co. v. Empire Trust Co., 262 N. Y., at p. 187). The conditions on the negotiation of order paper make it a safe way *236 of preserving its value while unindorsed in the hands of the payee. This is particularly true where the order paper is a cashier’s check drawn on a first class hank. The rule urged by Manufacturers would destroy the security purposely afforded the holder in due course of order paper. In effect, the rule urged by Manufacturers would, in the initial stage of negotiations, make no distinction between order paper and bearer paper, in conflict with the primiary engagement embodied in order paper, because it would make it possible for a thief to transfer validly a negotiable instrument without the payee's indorsement.
It may well be that banks often take back unindorsed cashier’s checks from their customers, but if they do, it does not mean that they are not or should not be liable, when it turns out that the checks have been delivered and not returned by the payee (see 40 Banking L. J. 527, supra). Banks often do many “ irregular ” things for trusted customers. They often, find the practice is increasing, accept checks for deposit from trusted and responsible depositors without legally required intermediate indorsement. They often pay out on overdrafts or on letters of credit where the tendered documents are not in perfect order. This they do sometimes with collateral letters of indemnity, as was done in this case with the North Bergen bank, and sometimes without. The point is that when they dq these things they de so at their bank’s risk. That is why, unless their own employees have also been dishonest, they will not do these things except for customers whose honesty and responsibility is unquestioned by them, even with letters of indemnity.
No previous decision has been found dealing with the misappropriation of a cashier’s check from the payee and its return to the drawer bank by the purchaser, if only because none would have previously questioned the applicable rule. The problem, and the obvious rule, has been discussed, however, both in this country and Canada. Repeating, in part, material quoted from the Banking Law Journal at the beginning of this opinion: “Before canceling the draft and returning the money, the bank should ascertain whether such delivery has been made. It is possible in a case of this kind for the purchaser to deliver the draft to the payee and thereafter *237 wrongfully regain possession of it. If the hank finds this to be the situation, it should refuse to cancel the draft. By paying the draft in such circumstances the bank would render itself liable to the payee.” (40 Banking L. J. 527, supra.) In Canada, similarly, a bank will be liable on the instrument for failing to ascertain whether or not a recredited certified check has been delivered to the payee (see Outstanding Certified Cheques, 26 Canadian Bar Assn. Proceedings 126, 142). No contrary rule has been found or cited in other countries which follow the law merchant.
There is dictum by a lower Illinois court in 1889 stating that possession of a certified check by the drawer raises a presumption that it has not been delivered (Buehler v. Galt, 35 Ill. App. 225). (In the case before us, despite the reversal below, there is an affirmed finding of fact that the checks were delivered.) Nevertheless, Manufacturers, relying on the purported dictum, in the Illinois case, states as doctrine that a bank may accept return of official checks for cancellation from its purchaser, usually a depositor of the bank, on the presumption of nondelivery and that the purchaser, therefore, is still the owner. Evidently, the presumption is now being held conclusive, irrespective of whether the check had ever been delivered to the payee.
The issue in the Buehler case (35 Ill. App. 225, supra) was simply whether the drawer of a certified check before actual or constructive delivery to the payee may return the check for cancellation and demand recredit to his account. Since the proof established no delivery to the payee, the drawer, under an obvious principle amounting to a truism, remained the owner of the check entitled to return it for cancellation and reimbursement. Subsequent cases have treated Buehler as authority only for the proposition that until delivery, either actual or constructive, the drawer retains ownership of a certified check with the right to have it canceled, or stating the proposition in the obverse, a payee’s rights attach only after delivery of the check (McIntire v. Raskin, 173 Ga. 746; Umbsen v. Crocker First Nat. Bank of San Francisco, 33 Cal. 2d 599 [Traynor, J.]; cf. Ann., Checks — Certification — Stopping Payment, 35 A. L. R. 942, 944). Where delivery has been proven, as in this case, the Buehler case has been held inappli *238 cable (Crisp v. State Bank of Rolla, 32 N. D. 263).
Of course, banks can always purport to cancel official checks upon request by their depositors whether or not there'-has been delivery to the named payee. Customer relations and an appreciation of the limited risk involved may prompt banks to cancel such checks without a payee’s indorsement or without ascertaining if the payee has any rights to the instrument. But invariably, in that riskful situation, the bank will seek to protect itself by securing the “ endorsement ” of its depositor-purchaser before cancellation. Indeed, a banking text explaining the practical operation in canceling unused certified checks suggests that the depositor’s “ endorsement ” is sufficient (L. H. Langston, Practical Bank Operation, pp. 68-69). Obviously, the need for the “ endorsement ” is to obtain a guarantee from the customer to cover the bank’s risk. Interestingly, the Officers’ Manual for Manufacturers Hanover, received in evidence, suggests a similar procedure, but approval from an officer must be obtained before the payee’s indorsement will be waived. Before waiver, the customer’s indorsement is required with the legend “ Not used for purpose issued” together with the approving officer’s notation ‘ ‘ Indorsement Waived ”.
The practices, last discussed, fortify the conclusion that the returned check without the payee’s indorsement exposes the bank to liability, if it should eventuate that the check had been delivered to the payee and the customer is no longer the owner. Hence, the need for the guarantee and officer approval before waiver of the payee’s indorsement. If the payee’s indorsement were not necessary, it would not have to be waived. Of course, the' guarantee is no better than the customer’s responsibility, the credit risk assumed by the bank.
Manufacturers argues that it proved a banking practice in New York contrary to the rule of law discussed. That narrow practice is detailed and analyzed above. Beyond that, the single expert testimony offered to prove the practice never yielded an opinion of general practice and was finally com fined to a statement that the witness in his personal experience knew of no instance in which a bank had refused to cancel a purportedly unused cashier’s check at the request of the purchaser or that the bank had any responsibility to *239 verify the status of the check with the named payee. As a matter of fact, the witness’ testimony is largely consistent with the practices detailed and analyzed above. Surely, the banks do these things, but when they do, they knowingly do so at risk of liability to the payee and with recourse, if they have been careful, to a responsible customer.
Moreover, as the trial court found, the return of 12 checks aggregating more than $17 million in less than a month, some on the same days totaling over $3 million, was enough to put Manufacturers on notice. A bank is bound by contractual obligation to the exercise of due care in the payment of checks and one has a right to rely on a bank to be careful not to pay out money to the wrong person (cf. Gutfreund v. East Riv. Nat. Bank, 251 N. Y. 58, 64-65, supra). Since Manufacturers acted on instructions from the small North Bergen bank, North Bergen had a similar duty of inquiry, and presumably, it has an obligation to indemnify Manufacturers for any loss. Actually, Manufacturers obtained a letter of indemnity from North Bergen in connection with its unfunded, check-clearing account, demonstrating that it was on notice of unusual, if not irregular, transactions.
"tip to this point, it has been assumed that the checks were stolen from Bunge. Manufacturers would not be liable, however, if Bunge’s agent, Oaterina, was authorized to exchange the checks, or if responsible Bunge officials knew of the exchange; that is, if the checks had not been stolen.
Mr. Groeneveld, Bunge’s assistant treasurer, testified that he gave Mr. Oaterina the cashier’s checks in question with instructions ‘ ‘ to get them in the bank. ’ ’ Mr. Polakowski, Groeneveld’s assistant, also testified that the checks were given to Oaterina for deposit. According to a Bunge internal organizational memorandum, Oaterina’s duties included supervising cash activities and maintaining records. It was Oaterina’s superiors, however, and not Oaterina, who had authority to “Review * * * checks issued by all New York companies ”, and to approve extensions of credit. The question of authority turns on the nature of Oaterina’s authorized duties, and not on whether he was an “ officer ” or not. There is no testimony indicating Oaterina had authority to switch the cashier’s checks for ordinary checks. Indeed, the switch *240 only makes sense as an act of theft.
What has been said so far more than demonstrates that Caterina was without authority to switch cashier’s checks for Allied’s ordinary checks. More than this is not necessary to find in favor of Bunge on the limited issue of authority. But Bunge has offered as an -exhibit, and the trial court admitted ..as a declaration against interest, a sworn statement of Caterina taken two days after the conversions were discovered. The affidavit describes the method by which the checks were switched and the manner of concealing the exchanges and non-deposits by false book entries.
Undoubtedly, the affidavit exposed Caterina to civil and criminal sanctions. As the trial court observed, the statement “ confesses to. conversion, larceny, falsifying business records and receiving commercial bribes ”. Since Caterina was evidently unavailable for trial, and assuming that it is necessary to reach the issue, the affidavit was admitted as a declaration against interest (People v. Brown, 26 N Y 2d 88, a case a fortiori, since it involved a criminal prosecution; see Richardson, Evidence [9th ed.], §§ 236-247; Ann., Refusal to Testify — Effect—Past Statements, 43 ALR 3d 1413). Manufacturers, however, argues that the circumstances of the writing — that it was given to Bunge’s lawyers a few days after Caterina’s employment terminated — requires its exclusion. Such a rule might seriously undermine the usefulness of the hearsay exception in cases of employee defalcations. As recently stated in a case allowing hearsay declarations of theft after discovery: ‘' Employee misappropriation usually is committed in secret, admissions of guilt are generally made, not at the time of defalcation, but at a time of subsequent investigation or apprehension ” (Alexander Grant’s Sons v. Phoenix Assur. Co., 25 A D 2d 93, 97). Of. course, circumstances of the' making of the extrajudicial statement will go to its weight. To repeat, however, the affidavit was not essential; it merely corroborated the testimony of Bunge officers that Caterina had no authority to convert the individual transactions from a cash basis (cashier’s checks) to a credit basis (Allied’s ordinary checks).
Even if one were to assume, and there is no support in this record to establish more than unacceptable suspicion, that *241 Bunge was a part of the Allied conspiracy, the switch served no purpose. The switch was only between Bunge and Allied and no third parties were to be deceived by the display of cashier’s checks. Since Bunge sold the warehouse receipts for the checks, it is the only visible victim, at this stage of the scheme.
Bunge is not chargeable with the knowledge of its employee Caterina. Since Caterina was acting outside his authority his knowledge is not notice to the principal (Abbott, Notice to a Corporation from Entries on its Books, 26 Harv. L. Rev. 237, 238). In particular, knowledge of the employee is not charged to the corporation where the employee is stealing its property (e.g., Hartford Acc. & Ind. Co. v. Walston & Co., 21 N Y 2d 219, 225-226; American Sur. Co. v. Pauly [No. 1], 170 U. S. 133, 156-157 [Harlan, J.]; Ann., Imputing Agent’s Knowledge to Principal, 104 A. L. R. 1246). There was no evidence that any Bunge employee other than Caterina knew of the witched checks.
Ratification of Caterina’s unauthorized delivery of the checks would have required full knowledge of the facts by responsible Bunge officials (Wagner Trading Co. v. Battery Park Nat. Bank, 228 N. Y. 37, 43-44, 46; cf. Soma v. Handrulis, 277 N. Y. 223, 230; Merritt v. Bissell, 155 N. Y. 396, 400-401; cases such as Grace v. Corn Exch. Bank Trust Co., 287 N. Y. 94, involve a special rule where bank records show that trust assets have been converted to the personal use of the trustee and the bank benefits thereby). In this case there is no evidence that responsible officials actually knew of the exchange of checks.
To infer knowledge by Bunge’s officers of Caterina’s check-switching, the majority in this court, as did the Appellate Division, relies and refers to internal reports submitted daily to Bunge’s treasurer, McNamara, and other daily reports submitted to Bunge’s president, Klein. The reports received by the treasurer from Caterina were a series of “ daily cash control sheets ” prepared by Caterina, showing the aggregate, and only the aggregate, daily deposits in the Bunge bank .accounts. The reports received by the president were each on “ a little slip of yellow paper ’ ’ prepared by the treasurer which summarized in two aggregate figures the cash on hand *242 and the bank loans outstanding. These internal reports by Caterina and the treasurer were never offered or received in evidence.
Two exhibits, on the other hand, received in evidence, often and still confused with the internal reports, are reconstructions made by Manufacturers for use in this litigation. They purportedly show weekly summaries of Caterina’s daily cash control sheets listing aggregate deposits in some 14 Bunge bank accounts. They do not show the items which had been deposited, and particularly they do not identify proceeds- on Allied sales transactions. Included in the lower left corner in these reconstructions prepared by the bank for this litigation is a list of cashier’s checks received by Bunge from Allied with their dates and amounts. (If Caterina’s daily reports had been introduced into evidence, they would have contained no information regarding receipt of cashier’s checks or Bunge’s daily warehouse receipt transactions.) Without this comparison, no inference of nondeposit or delayed deposit could be drawn, and, hence, no further inference of knowledge of check switching. But, and this must be emphasized again to dispel the persistent confusion, the exhibits with the telltale comparison of daily bank deposits and receipt of cashier’s checks were litigation weekly reconstructions rather than Bunge internal reports that were passed “ daily” to the high Bunge officers.
Nevertheless, Manufacturers’ defense of knowledge might have been sustainable if there were proof that Bunge’s treasurer or president Imew or must have known both of the receipt of the cashier’s checks and Caterina’s daily deposits. There was no such proof. True, the treasurer received Caterina’s daily cash control sheets and from them had knowledge of the daily deposits. But there is nothing in the record to show that he knew of the daily transactions with Allied, and, therefore, the receipt of checks from Allied. Although the president also received weekly “ comparative financial position ” reports and “commodities positions” reports, Manufacturers has failed to demonstrate in what way these weekly reports may be said to have given the president knowledge of -delays in depositing Allied’s checks. Indeed, the comparative financial reports were never introduced into evidence.
*243 The two preceding paragraphs make it clear that even the original documents, that is, the daily control sheets and the cash balance yellow slips, would not have brought home knowledge to Bunge’s high officers. Perhaps, if the treasurer had been shown to have known of the cash sales to Allied precisely when they occurred, as Groeneveld knew, then knowledge might have been established. In that event, the treasurer could have seen from Caterina’s reports that the cashier’s checks had not been deposited promptly. As for the president, he received commodity reports which, however, did not show with whom the commodity transactions had been conducted. Even at that, they were weekly not daily reports. In sum, information available to different officers would have had to be combined to bring home knowledge of delayed deposits. The dispersion of knowledge is exactly what faithless employees like Caterina rely on to effect their manipulations. The defense fails just because Manufacturers has never shown such combined knowledge, except by the misleading reconstructions of the daily cash control reports.
A final comment is indicated. Not only is an affirmance in favor of Manufacturers on the principles urged by it destructive of accepted banking and commercial practices, but it depends upon an evaluation not justified by this record that Bunge is in particeps criminis with Allied. There is no doubt that various degrees of greed and chicane tempted the actors and the victims in the complicated swindle. To be sure, swindlers often lull their victims into supineness by the riches displayed before them; but this does not, without more, make the victim a criminal. Indeed, when one considers the role played by the small North Bergen bank, and Manufacturers’ gullibility in repeatedly issuing “ rubber ” cashier’s checks against the small bank’s “account”, it is hard to say who was more gullible, more greedy, or more infested with dishonest employees in the pay of Allied. In any event, recognized principles governing negotiable instruments should be applied.
Accordingly, I would reverse the order of the Appellate Division, and reinstate the judgment rendered at the Supreme Court.
*244 Judges Scileppi, Bergan and Gibson' concur with Judge Burke ; Judge Breitel dissents and votes to reverse in a separate opinion in which Chief Judge Fuld and Judge Jasen concur.
Order affirmed, with costs.

 The cases discussed by the majority in this context, in support of a strained application of “equitable estoppel”, involve bearer paper, or paper or secure ties indorsed in blank. They are Irrelevant, as is, therefore, the doctrine applied. Two cases cited not involving negotiable instruments were concerned either with fully executed documents left lying about or employees with apparent authority. On equitable estoppel, see, generally, 21 N. Y. Jur., Estoppel, § 21, et seq.